631 So.2d 1176 (1994)
Stephen J. DAVID and Iris Maglone David
v.
CAJUN PAINTING, INC.
No. 92-CA-722.
Court of Appeal of Louisiana, Fifth Circuit.
January 25, 1994.
Rehearing Denied March 17, 1994.
*1177 Lewis O. Unglesby, Karl J. Koch, Unglesby & Koch, Baton Rouge, Jewel Welch, Jr., Baker, Anthony J. Nobile, Martin, Himel, Peytavin & Nobile, Lutcher, for plaintiffs/appellants Steven J. David and Iris Maglone David.
Donald A. Hoffman, Paul J. Politz, Ann Marie LeBlanc, New Orleans, for defendants/appellees Cajun Painting, Inc. and Lexington Ins. Co.
Before GAUDIN, GRISBAUM and CANNELLA, JJ.
CANNELLA, Judge.
Appellants, Stephen David (David) and his wife, Iris David, appeal from a jury verdict in a tort action, arising from injuries he received when accidentally sprayed in the face with toxic paint while employed as an electrician's helper at the Texaco Refinery in Convent, Louisiana. The jury apportioned fault to David of 5%, to his employer, Davis International/Davis Electrical Constructors, Inc. (Davis) of 15%, to Process Services, Inc., S & B Engineers and Constructors, Inc. (PSI) of 60%, and to Cajun Painting, Inc. (Cajun) of 20%. The trial judge rendered judgment pursuant to the jury verdict and reduced the award to appellants by the proportion of fault assessed to David. We affirm in part, amend in part, and affirm as amended. We also reallocate Davis' employer fault according to the ratio of proportionate fault of all of the other blameworthy parties.
In late 1988, Texaco Refining and Marketing, Inc. (TRMI) initiated maintenance and repairs to the Dimersol Unit located in the Convent refinery. In order to facilitate the work, it hired PSI and its alterego, S & B Engineers and Constructors. PSI was the general contractor. PSI hired various subcontractors, including Davis, who was hired to perform electrical work, and Cajun, a painting contractor. PSI coordinated the activities *1178 of the various subcontractors to see that the work was performed in an orderly manner. In connection with this, PSI had an employee, Gene Borque, located in a first-aid trailer near the unit, in charge of on-site safety. No joint safety meetings were held between PSI and Davis. However, Davis held its own safety meetings and provided safety updates to its employees. Regardless, all employees of all crafts were expected to use caution and look out for workers from other crafts.
The Dimersol Unit is a huge area containing "bays" within which are pipe racks. The unit has thousands of feet of space and more than one craft can work in the unit at the same time. Employees of Davis and Cajun could work at opposite ends without interfering with each other.
Each morning the various subcontractors were issued permits to work in an area of the refinery. The permits were issued by TRMI and reflected that a particular area was "safe", in that there were no Texaco operations in progress which would pose a hazard to the craftworkers. On December 7, 1988, both Davis and Cajun were given permits, and other workers were also working in the area, some of whom were Texaco employees.
David was working for Davis as an electrician's helper on the day of the accident, December 7, 1988. He had been working in the unit from approximately 6:30 a.m. Prior to entering the area he observed signs warning that spray painters were in the unit. The signs were located at each entrance to the Dimersol Unit. Following the lunch break, David and a foreman, Jimmy Branyon, were terminating electrical wires. At approximately 2:00 p.m., David was following Branyon, placing covers and gaskets on certain fittings. Another Davis foreman, James Stormo, was nearby observing the work.
While David was performing his job, a Cajun employee, Stacy Brouillette, entered the work area, spraying the pipe on the racks. He was using a high pressure paint containing Tolume, Xylene and Titanium Dioxide, hazardous and toxic substances with a heavier than air density. The racks were located approximately fifteen feet from the ground in bays approximately 20 feet wide. Brouillette's equipment consisted of a sprayer, a 100 foot long hose and paint pots located under the racks on the ground floor. The alleyway bisected the racks and the pots were visible to anyone walking down the aisle.
Brouillette was wearing a full face shield and breathing apparatus as protection from the toxins in the paint, because the sprayer discharged a mist "overspray" along with the paint. The mist, traveling as far as 30 feet, settled on Brouillette's glasses and generally interfered with his vision. Between the overspray and the face shield, he was unable to see farther than a few feet.
Brouillette ordinarily had a helper who walked along the floor beneath the racks, but the helper was not working with him that day. Earlier in the day, Brouillette had been on the side of the unit where the Davis employees were, but not close to the place of the accident. Prior to this day, he had been working at the other end of the unit. A shift in the wind caused him to change his work location to the side in which the Davis employees were working. Neither the Cajun workers nor the Davis workers were aware of each other. However, Brouillette had been in the vicinity prior to the lunch break.
Brouillette was accompanied by another painter. The two painted the pipe in the bays in layers. They began at the top of the rack in each bay, then dropped to a lower level to reach the underside. This caused them to move in a backward direction.
The paint equipment made a loud noise and produced paint odors. However, the entire unit was noisy due to the operation of various equipment and numerous other odors were in the air from various sources. Near David, high pressure steam lines were noisily releasing steam, preventing him from hearing the painters approach his work area. The painters, who did not check for other workers, failed to see David and the other Davis employees as they worked their way toward them.
Branyon, and then Stormo, noticed Brouillette as he blindly worked his way toward David. They tried to warn David and Brouillette, but the noise prevented their yells from *1179 being heard. Finally, David looked up. As he did so, Brouillette, who was five feet away and a few feet above him, and who was unaware of David, sprayed paint directly into David's face.
None of the Davis' employees wore protective equipment. According to the Davis' handbook, respiratory equipment was required when a known hazard existed. Although Stormo knew Cajun was in the Dimersol Unit, the Davis foremen were not aware that the Cajun employees were going to be painting in their vicinity, and thus, no respiratory gear was provided. Consequently, David inhaled the toxic paint and within hours was hospitalized for respiratory problems. He suffered severe respiratory disease and contracted permanent reactive airways disease as a result of the inhalation of toxic chemicals.
David received workers compensation. On September 28, 1989 he and his wife filed a tort suit against Cajun and its insurer, Lexington Insurance Company (Lexington). Davis' workers compensation carrier, Home Indemnity Company (Home), filed a Petition of Intervention to recover the compensation payments it paid to David. On September 5, 1990, Cajun and Lexington filed a Third Party Demand against TRMI and PSI/S & B. Those claims were dismissed after appellants settled with TRMI and PSI/S & B. Both Home and appellants reserved their rights against Cajun.
The case against Cajun and Lexington was tried by a jury from August 27 to 30, 1991. On August 30th, the jury found David 5% negligent, Cajun 20% negligent, PSI/S & B 60% negligent and Davis 15% negligent. It awarded David $476,700 and his wife $15,000 for loss of consortium.
Following the verdict, the trial judge ordered appellants' counsel to submit a judgment. Counsel drafted a judgment, but a dispute arose between David and Cajun concerning the amount of recovery. Thus, on September 13, 1991, David filed a Motion To Set Hearing On Judgment. On September 17, 1991, Cajun filed a Motion To Enter Judgment for only its percentage of fault. On September 27, 1991 Home filed an opposition to Cajun's motion.
In his post-trial memorandum, David argues that the final award should ignore the fault assessed against Davis and PSI, because the jurisprudence prohibits consideration of the employers fault in a suit by the employee against a third party tortfeasor. He alleges for the first time that PSI was his statutory employer. Cajun asserts that the jurisprudence was implicitly overruled by the 1987 amendment to La.C.C. art. 2324 which limited solidary liability of joint tortfeasors. The trial judge concluded that it was too late for David to raise the statutory employer status of PSI and that the jurisprudence no longer applies to facts occurring after 1987. He then rendered a judgment reducing appellants' recovery by both David's five per cent and the percentages of fault attributable to PSI and Davis. The intervenor was awarded $9,600 in paid-out compensation benefits.
On appeal, David first asserts that the jury erred in finding anyone other than Cajun at fault. He contends that the evidence shows that Cajun breached its duty to maintain a clear lookout, to check the area before spraying paint near other workers and/or take other measures such as current warning signs or barricades to prevent the other craft workers from entering the area. Second, he argues that the trial judge erred in reducing the award after considering the fault of Davis and PSI, as employer and statutory employer. Third, he alternatively contends that the trial judge erred by not awarding him a minimum of 50% under La.C.C. art. 2324.
This court carefully considered the testimony of the men who were working at the accident site at the time of David's injury. Brouillette testified that he worked earlier in the day in different bays of the Dimersol Unit. He stated that he did not notice any of the electricians, but that he did not really look. He stated that the wind direction caused him to work in this area after lunch and that he had not been in that particular area before. Brouillette testified that he normally had a helper who remained on the ground while he walked the pipe racks spraying the paint. He said that on this day he did not have a helper to watch for other *1180 workers, but entered the area alone spraying paint, almost blindly. Brouillette testified that the mist created by the paint can travel 20 to 30 feet and that it falls downward through the pipe because it is heavier than air. He stated that the high pressure steam lines, the cranes and another Texaco unit in full production were all making substantial noise.
Stormo, Branyon and David stated that they worked in the area all day and no painters were in the vicinity. Branyon testified that no painting had occurred for several days prior in the area of the accident and that there were no paint pots anywhere near. He and Stormo stated that respiratory protection was not required by the handbook unless there was a known hazard in existence. Branyon and Stormo also stated that the workers should be and are aware of the need to be sensitive to the presence of other craft workers because of the number of different crafts operating in the unit.
David testified that he was unable to hear the warning because of the noise of the nearby pressure line releasing steam. He also testified that the Cajun sign, which warned of painting in the area, referred to the whole Dimersol Unit, which consisted of thousands of feet of space, and not for a particular portion of the large unit. David also stated that he had no reason to expect a Cajun employee to be working in the specific area, because there had not been anyone from Cajun working there prior to this incident.
The evidence shows that PSI, the general contractor, along with the plant operator, TRMI, was primarily responsible for supervising the construction site. This was reflected in an instruction given to the jury, without objection. Borque, the PSI safety man, was delegated the safety responsibility to ensure that the craftsmen worked safely together and did not get in each other's way.
An appellate court may not modify or reverse a factual finding of the trial court in the absence of manifest error or unless it is clearly wrong. Arceneaux v. Domingue, 365 So.2d 1330, 1333 (La.1978). Findings of respective percentages of fault under La.C.C. art. 2323 are factual findings subject to the manifest error rule. Devereux v. Allstate Ins. Co., 557 So.2d 1091, 1095 (La.App. 2nd Cir.1990).
The facts herein are basically uncontradicted. Simply put, the issue is whether the evidence supports the jury's apportionment of fault. We find that the evidence does not support the verdict of the jury and that the jury was clearly wrong in the percentages of fault that it allocated.
Brouillette was working with very hazardous material. He was unable to maintain a lookout for other employees due to his restricted vision. He failed to have a helper. He failed to check the area for others, although he knew that other craftsmen were working in the Dimersol Unit. He knew that the paint contained toxins, that the overspray travelled a good distance, and that it fell downward due to its density. Furthermore, Cajun permitted Brouillette to work blindly, which endangered the workers in the unit. They were without any immediate safeguards, such as barricades or localized signs, which would have placed others on notice that the painters were in the immediate vicinity. Thus, Cajun was substantially at fault. Yet, David and his employer should have been more attentive, especially considering the noise level and the knowledge that the painters were somewhere in the unit. In addition, PSI/S & B should have prevented accidental overlapping of the craftsmen in each others work area, particularly considering the danger presented by the spraying of chemicals into the air. But nonetheless, it was Cajun who handled the materials and was in the best position to avoid the accident and it was PSI/S & B who was primarily responsible for the overall safety of the job. Thus, after reviewing the evidence, we find that the appropriate allocation of fault should be Cajun of 40%, PSI/S & B of 40%, Davis of 15%, and David of 5%. The judgment is hereby amended to reflect these percentages.

Employer Fault
Appellants next assert that the trial judge erred in reducing their recovery by the percentages of fault attributed to PSI/S & B and Davis. They contend that the law prohibits quantifying or consideration of an employer's *1181 fault in an employee's action against a thirdparty tortfeasor.
Cajun raised several objections to this argument. First, it asserts that the appellants failed to object to the jury interrogatories which referred to the fault of PSI and Davis. Second, it contends that appellants failed to carry their burden of proving PSI is a statutory employer. Third, it argues that the 1987 amendment to the Civil Code, Article 2324, which limits solidary liability in tort cases, changed prior law in this regard, making a tortfeasor liable only for his/its proportionate share, or at the most for a maximum solidary liability up to 50%, regardless of "immunity by statute."
The failure to timely object to a jury instruction or interrogatory constitutes a waiver of the party's right to raise the issue on appeal. Crawford v. Bon Marche, Inc., 540 So.2d 376, 377 (La.App. 1st Cir. 1989); Wisner v. Illinois Central Gulf R.R., 537 So.2d 740, 751 (La.App. 1st Cir.1988), writ denied, 540 So.2d 342 (La.1989). Failure to object deprives the trial court from preventing the alleged error. Maxwell v. Soileau, 561 So.2d 1378, 1386 (La.App. 2d Cir.1990). Thus, appellants failure to object timely at trial to the jury interrogatories related to the employer's fault was waived. However, this does not end our inquiry. As Justice Lemmon stated in his dissent in Guidry:
"The handling of employer fault in cases with multiple tortfeasors presents two principal questions: (1) whether the jury should allocate a percentage of fault to the employer and (2) how that percentage allocation should affect the rights of the plaintiff, the employer, and the remaining tortfeasor or tortfeasors."
Guidry v. Frank Guidry Oil Co., 579 So.2d at 955.
In effect, the quantification by the jury does not necessarily mandate that the award be reduced accordingly. Thus, although appellants cannot complain that the jury assessed the percentage of fault to the employer, the legal issue remained for the trial judge to determine whether those percentages could be or should be used to reduce their recovery and the tortfeasor's liability.
The second argument asserted by Cajun relates to the failure of appellants to prove that PSI is a statutory employer. They argue that a contract between PSI and Davis, filed into the record in conjunction with the third-party demand, is proof of this relationship. There was very little evidence at trial of the relationship between PSI and Davis, other than that PSI was the general contractor and Davis was hired by PSI. Also, the contract referred to by appellants was not introduced into evidence. Evidence filed into the record, but not introduced formally at trial, may not be considered by the appellate court. Touzet v. Mobley, 612 So.2d 890 (La.App. 5th Cir.1993); Succession of Montegut, 430 So.2d 1024 (La.App. 5th Cir. 1982). Vol. 1, McCormick on Evidence, § 51 at 194, (4th Ed.1992).
Consequently, there is no evidence of the PSI status as a statutory employer. Furthermore, we find that appellants waived the issue when they failed to request this be made part of the jury interrogatories.[1] Thus, we find that the trial judge did not err in concluding that appellants were precluded from raising the issue of whether PSI was a statutory employer.
We next address the question of whether the trial judge erred in reducing the award by Davis' percentage of fault. In factual situations which occurred prior to 1987, the jurisprudence held that the employer's fault could not be considered in apportioning fault in an employee's action against a third-party tortfeasor. See: Guidry v. Frank Guidry Oil Company, 579 So.2d 947, 953 (La.1991), Melton v. General Electric Co, Inc., 579 So.2d 448, 451-452 (La.1991). The courts found consideration of employer fault to be inappropriate because it would violate the bargain between worker and employer embodied in the workers compensation act to exclude the concept of employer fault for purposes of tort liability (or contribution or indemnity). See: Guidry at 953, Melton at *1182 452. (Both Guidry and Melton involved facts occurring prior to 1987).
In 1987, La.C.C. art 2324 was amended to state as follows:
Art. 2324. Liability as solidary or joint and divisible obligation
A. He who conspires with another person to commit an intentional or willful act is answerable, in solido, with that person, for the damage caused by such act.
B. If liability is not solidary pursuant to Paragraph A, or as other wise provided by law, then liability for damages caused by two or more persons shall be solidary only to the extent necessary for the person suffering injury, death, or loss to recover fifty percent of his recoverable damages; however, when the amount of recovery has been reduced in accordance with the preceding Article, a judgment debtor shall not be liable for more than the degree of his fault to a judgment creditor to whom a greater degree of fault has been attributed. Under the provisions of this Article, all parties shall enjoy their respective rights of indemnity and contribution. Except as described in Paragraph A of this Article, or as otherwise provided by law, and hereinabove, the liability for damages caused by two or more persons shall be a joint, divisible obligation, and a joint tortfeasor shall not be solidarity liable with any other person for damages attributable to the fault of such other person, including the person suffering injury, death, or loss, regardless of such other person's insolvency, ability to pay, degree of fault, or immunity by statute or otherwise.
Cajun and the trial judge relied on the last sentence of Subsection B to support their conclusion that Guidry no longer applies to facts occurring after 1987. They contend that this language is the "express legislative directive" that the court in Guidry said was needed to quantify an employees' fault. See: Guidry, 579 So.2d at 953.
After this case was decided in the district court and while it was pending here, the Louisiana Supreme court granted writs and resolved the issue of whether employer fault should be quantified and, if so, what effect that has on the remaining defendants.[2] In Gauthier v. O'Brien, 618 So.2d 825 (La. 1993),[3] the court stated that "the assessment of employer fault is made mandatory by the 1987 amendment to La.Civ.Code art. 2324(B)..." Id. at 831. It further held that while the jury must quantify the employer's fault, in order to enable it to "reach a fair determination of the relative fault of all blameworthy parties, the judge must then disregard "the proportion of fault assessed to the employer and reallot the proportionate fault of all other blameworthy parties" according to the ratio approach utilized by the Louisiana Supreme Court in the Guidry case. Id. at 832 and 833.
While appellants agree that employer fault must be quantified, they also present three scenarios for allocation of the fault. However, the language of Gauthier is clear that the employer's fault be allocated proportionally among all other blameworthy parties.
The sole remaining question raised by appellants is whether PSI is a "blameworthy" party since it was not a party at trial due to its out-of-court settlement. We find that PSI is a "blameworthy party", as found by the jury. Consequently, the employer's fault (Davis at 15%) must be allocated, according to Gauthier, as follows:

1. DAVIS - 15% ............................. = 0%
2. PSI - 40% plus (40/85 × 15% = 7.06%) = 47.06%
3. CAJUN - 40% plus (40/85 × 15% = 7.06%) = 47.06%
4. DAVID - 5% plus (5/85 × 15% = .88%) = 5.88%
 _____ ________
 100% 100%

*1183 Accordingly, we hereby affirm the judgment as to the amount of the award, the intervenor's award, costs and interest. We amend the judgment to reflect the percentages of fault to Cajun of 40% and PSI of 40%.
We further allocate employer fault proportionally among all other blameworthy parties, as follows: PSI47.06%; Cajun47.06% and David5.88%.
The judgment is otherwise affirmed and costs of appeal are to be paid by appellee.
AFFIRMED IN PART, AMENDED IN PART AND AFFIRMED AS AMENDED.
NOTES
[1] See: La.C.C.P. arts. 1793, 1812 and 1813.
[2] Because the case was pending in the Louisiana Supreme Court, we removed this case from our docket with the consent of the parties, until the issue was decided. It was redocketed as soon as the decision was rendered.
[3] Gauthier v. O'Brien, 606 So.2d 915 (La.App. 3rd Cir. 1992), held that the amendment did not change the law and held that employer's fault was not to be quantified.