657 So.2d 241 (1995)
Henry E. YOES, Jr.,
v.
SHELL OIL COMPANY, et al.
No. 95-CA-12.
Court of Appeal of Louisiana, Fifth Circuit.
May 10, 1995.
Rehearing Denied July 17, 1995.
*243 Henry E. Yoes, Jr., Destrehan, for plaintiff/appellant in pro per.
Adams and Reese, Philip A. Franco, James G. Perdigao, Sean D. Moore, New Orleans, for defendants/appellees Shell Oil Co. and Fred Foster.
Before KLIEBERT, GRISBAUM and CANNELLA, JJ.
CANNELLA, Judge.
Plaintiff, Henry Yoes, Jr., appeals from a judgment dismissing his claim for damages resulting from an explosion at the Norco Refinery owned by defendant, Shell Oil Company (Shell).[1] The trial judge found that plaintiff did not carry his burden of proof and dismissed his case. We affirm.
On May 5, 1988, an explosion occurred at the Norco Refinery. On December 6, 1988, plaintiff, the owner of the St. Charles Herald (the Herald) newspaper, filed a petition, pro se and in forma pauperis, for property damages. He filed the claim against Shell, Brown and Root, Fred Foster, the manager of the refinery, Harold Richard, an insurance adjuster for Shell, CIGNA Insurance Co. *244 (CIGNA) and Worley Claims Service (Worley), another insurance adjusting firm. To the lawsuit he added ESIS, Inc., a CIGNA company, and was denied an attempt to add Adams and Reese, Shell's attorneys. He amended his petition numerous times asserting various conspiracy, fraud and deceptive acts of the various defendants, dilatory tactics in settling the claim, negligence related to the explosion and damages for loss of the sale of the newspaper.[2] He amended on April 25, 1989, adding loss of consortium as an element of damages. Defendants filed exceptions of vagueness, no cause of action, ambiguity and improper joinder of causes of action. In June, 1989, the trial judge, Judge Lewis Doherty, II, sitting ad hoc, ruled on the exceptions and dismissed all the claims against all defendants, except those against Shell, Foster and Brown and Root for damages from the explosion.
Plaintiff filed a writ application to this court which was converted to an appeal. This court affirmed in part and reversed in part in an unpublished opinion. In Yoes v. Shell Oil Company, et al, No. 89-CA-652 (La.App. 5th Cir. 3/14/90); 557 So.2d 1174, this court held that plaintiff may have raised sufficient facts to give rise to a cause of action for intentional interference with contract against Shell under 9 to 5 Fashions, Inc. v. Spurney, 538 So.2d 228 (La.1989) and remanded to allow plaintiff an opportunity to amend his petition, but only as to Shell. The claim against Shell and Foster for damages from the explosion was reserved for further proceedings. Otherwise, the judgment maintaining the exceptions was affirmed. Plaintiff amended his petition to allege intentional interference with contract, which included claims that he was deprived of his office and the use of his equipment resulting in the loss of the pending sale of the business. He alleged that he was forced to miss a regular edition of the paper and that the failure affected his ability to gain official parish journal status. He alleged that, as a result, he was later forced to sell the newspaper at a reduced price because the original sale failed to occur. However, he also continued to try to assert fraud claims. A motion to strike the fraud claims was granted by the trial judge.
In 1992, all claims against Brown and Root were dismissed. Numerous other motions and exceptions were filed by the parties. Defendants then filed a Motion for Summary Judgment and/or In The Alternative, Motion to Exclude Damages Not Supported by Appropriate Evidence. Plaintiff amended his petition twice more. Plaintiff continued to allege fraud and defendants filed more exceptions and a motion for contempt. In March 1993, the exceptions of res judicata, vagueness and no cause of action were referred to the merits. However, the trial judge again ordered the plaintiff not to assert fraud against any party.
On April 21, 1993, a pre-trial conference was held. A pre-trial order was signed by both parties on May 18, 1993. On May 26, 1993, a second ad hoc judge, Judge Remy Chaisson, partially granted the Motion for Summary Judgment, dismissing plaintiff's claims for loss of consortium and failure to settle.[3] Two motions for reconsideration of this dismissal were subsequently denied. On July 22, 1993, plaintiff filed a motion to amend his petition, alleging claims against Shell's "Legal Affairs Department". The trial judge denied the motion on September 1, 1993. On August 19, 1993 plaintiff also filed a motion to amend the petition to add Adams and Reese, the law firm defending Shell. The trial judge denied the motion because it was past the pre-trial cut-off date.
Trial was held before Judge Remy Chaisson on September 27, 29 and 30, 1993. Following presentation of plaintiff's case, defendants moved for involuntary dismissal, under La.C.C.P. art. 1672. The trial judge granted the motion after determining that plaintiff failed to prove that defendants interfered *245 with the contract in any manner and also failed to prove damages.
On appeal, plaintiff asserts that the agents of Shell, its law firm, Adams and Reese, intentionally interfered with settlement negotiations; that the trial judge erred in improperly denying plaintiff's motion to amend the petition to add as defendant, the law firm of Adams and Reese; that the attorneys representing Shell intentionally interfered with the contract to purchase the newspaper; that there were lost or misplaced pleadings that the trial court should have considered relative to a loss of consortium claim; that the trial judge erred in finding that the contract was terminated unilaterally; that the trial judge erred in dismissing his case on the motion for involuntary dismissal; and that the trial judge erred in failing to award damages.
Plaintiff represented himself in the trial court proceedings and on appeal. His brief contains numerous references to conduct and conversations by witnesses, non-witnesses and attorneys, which are neither part of the record nor introduced as evidence at trial. As explained to him by the trial judge, only the evidence produced at the trial (facts contained in testimony of the witnesses at trial and documents properly offered and introduced into evidence during trial) may be considered by the trial judge in reaching his conclusion. See: Vol. 1, McCormick on Evidence, Sec. 51 at 194 (4th Ed.1992). That principle also applies to the appellate courts. See: Uniform Rules-Courts of Appeal, Rule 1-3; David v. Cajun Painting, Inc., 92-722 (La.App. 5th Cir. 1/25/94); 631 So.2d 1176. In addition, plaintiff has also made comments related to the attorneys for defendants that are inappropriate and offensive, accusing them of "bad deeds" such as treating him as an extortionist and intimidating witnesses, including his children. He asserts that the actions of the attorneys of Adams and Reese in the defense of this case were wanton, malicious, reckless and intentional to inflict either a harmful or offensive impact upon him through legal subterfuges. He claims that they engaged in secret "depositions" and intentionally misled their client regarding the law on interference with contract [specifically, 9 to 5 Fashions v. Spurney, 538 So.2d 228 (La.1989)], in order to delay settlement with him and to ruin his business and proposed sale. Without considering the numerous references to off-the-record acts and conversations made by plaintiff, we reviewed the record and conclude that the deeds which he complains of here and in some of his petitions consist of the attorneys taking statements of witnesses without his knowledge and their refusal to capitulate to his demands because they disagreed with his interpretation of the law. No evidence of other instances of misconduct alleged by plaintiff was produced at trial, since the trial judge refused to allow an amendment to add the attorneys as defendants. The record, therefore, reflects no basis for these offensive accusations by plaintiff against the attorneys.
We note that attorneys are entitled to take statements as part of work product and it is the duty of the trial court, not the parties, to ultimately decide whether or not and to what extent the particular law applies. In order to do so, the trial court must be presented with facts (evidence) offered by the parties before the court can interpret the law in a given case. Furthermore, many of plaintiff's complaints about the attorneys relate to their actions interfering with any possible settlement between Shell and plaintiff. However, except for certain instances related to the insurer's duty to settle[4] set forth in the Louisiana statutes, Louisiana law does not impose a duty on a defendant to settle with plaintiff. Thus, a plaintiff cannot recover damages for failure to settle a case, except in the limited circumstances provided by statute. See: Guillory v. Gulf South Beverages, Inc., 506 So.2d 181 (La.App. 5th Cir. 1987). As a result, we find that plaintiff has no cause of action for damages against the attorneys for Shell for interference with a "possible" settlement.[5] Consequently, this court will ignore accusations of misconduct by the Shell attorneys and consider stricken *246 from the brief those offensive comments, accusations and off the record references, pursuant to Uniform Rules-Courts of Appeal, Rule 2-12.4.[6] We will address only the merits of plaintiff's properly appealed complaints.[7]
Plaintiff contends that the trial judge erred in refusing to allow him to amend his petition to add the law firm of Adams and Reese and/or attorney Don Almerico as defendants because they are indispensable parties. The trial judge denied the motion to amend because it was "too late". It should be noted that plaintiff amended his petition seven times during the course of the proceedings. The motion to amend to add the attorneys was filed approximately one month before trial, after the Pre-Trial Order was signed and after discovery was cut-off.
The Louisiana Civil Code defines indispensable parties. C.C.P. art. 641 states indispensable parties "are those whose interests in the subject matter are so interrelated, and would be so directly affected by the judgment, that a complete and equitable adjudication of the controversy cannot be made unless they are joined in the action." C.C.P. art. 642 provides that necessary parties are those whose interests in the subject matter are separable and would not be directly affected by the judgment if they were not before the court, but whose joinder would be necessary for a complete adjudication of the controversy. The failure to plead an indispensable party may be noticed by a party filing the peremptory exception or by the trial court and appellate court on its own motion. C.C.P. art. 645. The failure to join a necessary party may only be pled in a dilatory exception. Id.
Under La.C.C.P. art. 1151, plaintiff may amend his petition without leave of court prior to the answer being served or he may be ordered to amend when the court grants the dilatory, declinatory or peremptory exceptions. "Otherwise, the petition ... may be amended only by leave of court or by written consent of the adverse party." C.C.P. art. 1151. In regulating pre-trial procedures, La.C.C.P. art. 1551 states that the court may, in its discretion, hold a pre-trial conference and, if so, shall render an order reciting the action taken, the amendments allowed and the agreements made which limits the issues for trial. C.C. art. 1551 further states that: "Such order controls the subsequent course of the action, unless modified at the trial to prevent manifest injustice." The trial judge is vested with discretion in conducting the trial. La.C.C.P. art. 1631.
In this case, the trial judge allowed plaintiff to amend his petition numerous times. In some of the various petitions, he complained about the actions of various attorneys representing Shell. He had ample time to file a motion to amend the petition to add the attorneys as defendants over the earlier course of the proceedings. In addition, we find that the attorneys are not indispensable parties since the outcome of the litigation will not affect them. Even if they were necessary parties, an adjudication of an action may be made without joinder of a necessary party. See: C.C.P. art. 642. Thus, we find that the trial judge did not abuse his discretion in denying plaintiff's motion to amend the petition to add Adams and Reese or Don Almerico.
Since we find that the trial judge did not err in refusing to allow plaintiff an opportunity to amend his petition to add the attorneys representing Shell, they are not defendants to this action and neither the trial nor appellate courts can render a judgment for or against them. As a result, plaintiff's claims that those parties interfered with the purchase contract or damaged him in some other way are not properly before this court.
Plaintiff also contends that there were missing pleadings, on which the trial judge had not ruled. Although it is not clear, at least one of the missing pleadings appears *247 to relate to a claim for loss of consortium. Further, he argues that the actions of the attorneys and, apparently, Shell in not settling his claim, caused him to lose the affection of his children. The trial judge explained that regardless of the missing pleading, there is no cause of action by plaintiff for loss of consortium. Since plaintiff does not describe any other pleadings, we cannot state whether their absence caused him any prejudice.
Loss of consortium, loss of services and society are elements of damages that occurs to the relation of a party who suffers an injury under La.C.C. art. 2315. C.C. art. 2315 states that these damages are "recoverable by the same respective categories of persons who would have had a cause of action for wrongful death of an injured person." C.C. art. 2315.2 provides the cause of action for wrongful death to the spouse and/or children or father and/or mother or brother(s) and/or sister(s). It is due to family members of the injured party, not to the injured party, who has his/her own other elements of damages that are recoverable. Loss of consortium is a secondary layer of tort liability and derivative from the injury to the primary victim. See: Shepard v. State Farm Mutual Auto Ins. Co., 545 So.2d 624, 629 (La.App. 4th Cir.), writ denied, 550 So.2d 627, 628 (La.1989). Consequently, plaintiff has no right of action for a loss of consortium claim, as found by the trial judge, and the absence of such a pleading is irrelevant to the determination of his damages, if any.
Plaintiff's remaining arguments relate to the merits of whether he proved causation and/or damages from the explosion. Within these arguments, he complains that the trial judge erred in finding that the purchase contract was unilaterally terminated without his consent.
Joel Chaisson, II testified that he was interested in purchasing the St. Charles Herald, a newspaper over one hundred years old, owned by plaintiff. Chaisson stated that he approached plaintiff in March of 1988, prior to the explosion, to discuss the matter. He testified that the newspaper was having problems and he and plaintiff discussed how to improve the quality of the paper. Chaisson said that he had the financial ability to purchase the business in full ownership and wanted it for a long-term investment. He was also interested in keeping ownership of the paper in the parish. However, the sale was conditioned on the paper regaining official St. Charles Parish journal status, which it had lost some years before. Chaisson stated that he would assist plaintiff in getting the votes needed to obtain the official journal status. Chaisson testified that the paper did not have the quality to obtain official journal status in 1988, but that they were going to try to obtain it in 1989. Obtaining official journal status was important because of the income that the paper would receive from various governmental entities. Chaisson noted that money could then be used to increase circulation and advertising. He testified that he was not interested in purchasing the paper unless it obtained official journal status.
Chaisson stated that he agreed to purchase the newspaper for a price of $100,000 and would attempt to negotiate the major outstanding business debts for plaintiff. He asserted that he did not agree to assume the debts. In addition, Chaisson testified that he asked plaintiff to remain with the paper for approximately one year. After that, the parties were going to renegotiate. He did not remember how much he said he would pay plaintiff, but testified that it was not much. He also testified that he received positive feedback when he spoke to plaintiff's son, Henry Yoes, III, in regard to purchasing the interest of plaintiff's ex-wife, who still had an ownership interest in the paper.
In investigating the purchase, Chaisson met with the printer, Joseph Lucia, who was also one of the creditors. He agreed to continue printing the paper for Chaisson, but because he agreed to write-off the debt, he was going to raise his charges when Chaisson took over. Chaisson began speaking to people about becoming editor and considered plaintiff's daughter, Cindy, and Andy Duet. Eventually, he hired Duet to help with the daily operations because plaintiff expressed a need for assistance. He paid Duet $500 to $1,000 per month. Plaintiff was not happy with Duet, who was terminated sometime *248 after 1989, but Chaisson did not remember the date.
Chaisson testified that he did not want anyone to know that he was interested in purchasing the paper and requested plaintiff to keep his name secret. Nevertheless, Chaisson spoke to people about the Herald regaining the official journal status and believed he had the council votes necessary in 1989. However, as time went on and plaintiff failed to garner the required votes in 1989, Chaisson lost interest in the purchase. He believed that the agreement ended when the paper failed to become the official journal in 1989.
Chaisson stated that he saw the condition of the newspaper office in 1983 and had not been there until 1988. At that time, the paper was not being printed in its office. Printing was done elsewhere. Although he said that the explosion in May of 1988 affected plaintiff's ability to work out of his office, he did not testify why or how the office was affected. Chaisson further testified that after the explosion, he did not get involved in plaintiff's claims against Shell.
Andy Duet, the newsman hired by Chaisson, testified that he worked under plaintiff from September or October of 1989 through February of 1990. He and plaintiff had several disagreements and he was terminated when the purchase "fell through". He testified that the office had not been used for several years and that it had no utilities and no working rest room facilities. He said it was filthy and the equipment located there was broken and/or damaged. He stated that there were piles of old journals and unpaid bills on the counter. He first claimed that he observed this in 1988, but later said it was 1989, after he was hired by Chaisson. However, he claimed that plaintiff told him he had not used the office since 1984. Duet asserted that plaintiff started working out of his house between 1984 and 1985, where he had the telephone relocated and where Duet brought work to plaintiff. He noted that the printing was done by L'Observateur in LaPlace, Louisiana. Plaintiff's daughter did the paste-ups in her office in LaPlace and Duet worked at home. However, the papers were addressed at the Herald office where the plaintiff continued to keep the addressograph machine. Duet also noted that plaintiff moved the machine for a few weeks because the landlord of the building stated that he had to leave for awhile because the building was not safe due to damage from the explosion. After the explosion, Duet stated there was a tarpaulin and plastic over the ceiling where the tiles had fallen. However, he testified that the explosion did not interfere with the operations of the paper.
Paul Murray, an architect, testified that, for the owner, he evaluated the damage to the building in which the Herald was located. He stated that the explosion caused damage to the roof, the roof structure and the concrete block masonry. He further stated that he discussed with plaintiff the possibility of moving the Herald to a building which he owned.
Dennis Diehl is a self-employed claims adjuster who was working with Worley Claims Service relative to the claims for the Shell Norco refinery explosion. His job was to arrive at a dollar amount to compensate a party for damages from the explosion. He stated that he proceeded with the claim submitted by plaintiff as if it were one claim for the building and contents. When he discovered that plaintiff did not own the building, another adjuster was assigned to the claim for damages to the building, while he remained the adjuster for plaintiff.
Diehl stated that he viewed the office following the explosion. He stated there was debris everywhere. He said there were books and papers laying around the floor. Diehl asserted that plaintiff was paid $3,731.28 to cover the cost of cleaning and repairing five different machines located in the office. The company also agreed to pay any amounts over the amount paid upon submission of a bill. It would also have paid utility bills and outside stationery costs, but plaintiff failed to provide any documentation to support the items. Shell also paid a $175 telephone bill. In addition, it agreed to replace the carpet and replace stationary. Various letters were introduced on these items.
*249 Diehl stated that efforts were made to find another office for plaintiff due to his complaints and a moving company was arranged to move plaintiff. He noted that the newspaper was actually printed elsewhere, but the machines (printing presses) located in the office were for a printing business. Diehl said that plaintiff complained that he was losing money on the paper because he was shut down and was concerned about losing the official journal status. Diehl testified that plaintiff informed him that he and his daughter had not been taking any money out of the business before the explosion. The move never occurred, however. Diehl testified that he went to plaintiff's residence in 1988 and observed that plaintiff had a room set up for an office containing his computer, table and books. After plaintiff submitted a claim for the loss of the sale of the newspaper, he was requested to submit the name of the prospective purchaser and a copy of the written agreement. Diehl stated that plaintiff refused to provide either the name or the agreement. After the check was mailed to plaintiff in August 1988, Diehl was removed from the case. Diehl stated that he was relieved but unhappy because he liked to see a claim through to completion. However, he also testified that plaintiff failed to provide any of the documentation that was requested on various items, never told anyone exactly what he wanted nor did he provide a dollar figure for the remainder of his alleged damages.
William Kugler owned the building in which the Herald was located. He testified that it was built in 1959 according to plaintiff's design to house the Herald in 1959. He stated that the lease was up in 1989. Kugler asserted that plaintiff was delinquent from time to time on his rent, including the rent for 1988. As of the date of the explosion, plaintiff was in arrears on rent in the amount of $6,254.63 ($382.94 per month) and plaintiff stopped paying completely after the explosion. Kugler said that plaintiff planned to sell the business and pay the debt. He testified that the explosion caused severe damage to the building and plaintiff had to vacate it, although the equipment remained and plaintiff continued to address the papers in the office until he was told to stop. Kugler noted that plaintiff did his own printing in 1959, but in 1988 was sending the printing out. He testified that Shell paid the lease for four months. Kugler testified that the newspaper was bought by plaintiff's son in 1989. At that time, the front part of the building (roof, ceiling walls) was repaired, but not the rear.
Patrick Yoes, III (Yoes), plaintiff's son, testified that he assumed operations of the newspaper in September 1989. He is employed full time in the sheriff's office in St. Charles Parish, but has been involved with the paper since he was a child. He performed all types of jobs at the paper and became the expert at cleaning and repairing the printing presses and other machines. He testified that he wanted to save the paper because it is very old, he is a history buff and because of family pride. He purchased the paper for $2000 plus the assumption of the major debts. Although there were over $90,000 in back debts, some were prescribed. Yoes paid out the rest in the amount of $26,715.06. The only debt remaining was $1300 to the landlord. He renovated the office, the quality of the paper improved and in 1990, official journal status was awarded to the Herald. He stated that his father still writes the "profiles" for the paper.
Yoes stated that he was aware that the building had been damaged in the explosion, but said that the machinery did not sustain damage. The presses and other equipment only required cleaning, from the debris falling from the ceiling, to become functional. He explained that the presses were used for print jobs, which his father no longer did, not for printing the paper. He did not know if they were working prior to the explosion. He testified that all of the equipment in the office was old, but some pieces were over one hundred years old and still working fine. One piece was used for parts to repair the others. Eventually, he sold the presses which were not working. However, he noted they only needed a general cleaning. Upon questioning about moving the presses and the camera, he stated that someone with expertise would be needed to move the equipment because of the age of the pieces. *250 In particular the camera was delicately aligned. Yoes claimed that he worked on the presses at least up to one year before the explosion and at that time the building had electricity and a working lavatory. When he moved in he had to repair a lavatory, but the commode was working. However, he stated that the back area did not have electricity, but the back area was condemned due to damage existing from the explosion.
In regard to the general condition of the office, Yoes pointed out that the office was never really kept clean when doing printing and the newspaper because of the nature of the business. When he purchased the paper and moved in he repaired the ceiling, painted walls, added some electricity, linoleum, molding, etc. He also changed the floor plan for better efficiency and added air-conditioning. Yoes testified that telephone calls were forwarded to plaintiff at home and that, for awhile, he worked out of his house with the telephone calls for the paper forwarded to his house. Then he signed a new lease with Kugler and moved in the old building in March of 1990.
Yoes was questioned about the events surrounding the attempt to obtain official journal status in 1988. He stated that Duet nominated the Herald in 1988, but voted against the Herald when it came up for vote. At that time, the vote was six to one in favor of awarding the official journal status to another newspaper. In 1989, the Herald lost again in a vote of six to three for the other paper. Yoes stated that it was his understanding that the quality of the Herald was responsible.
Plaintiff testified about many of the facts already testified to by the other witnesses. However, he claimed that Chaisson offered him $25,000 per year to remain with the paper. He said that the explosion blew out the front door and front plate glass window and the ceiling fell over everything in the building. Plaintiff stated that Shell set up the move in November, but that a class action suit had been filed and the federal judge stayed all settlement activity. (He opted out of the class action.) Plaintiff asserted that he spent four months before the explosion repairing the equipment in the office because of the pending sale.
Plaintiff did not dispute that the paper was printed by L'Observateur and that the only thing being done at the office was addressing the papers. His daughter worked full-time for L'Observateur, but did paste-ups at her office after hours where she used their equipment. He worked out of his residence. Plaintiff stated that the Herald lost the official journal status in 1980, after which he intentionally wound down operations (reducing subscriptions, reducing staff to just he and his daughter) to save costs. He said that the other paper got the award because of the political climate in 1980. At the time of the explosion, the Herald was not making any money. Plaintiff admitted that the Herald only missed one publication after the explosion but that was because he had not paid the printer.
Plaintiff contends that Chaisson is still obligated under their agreement. However, he then testified that it had lapsed since it has been six years since they made the agreement. He admitted that he received a check from defendant to clean the equipment in the office, but did not use the money for that purpose. He agreed that Murray would have rented the other building to him for a limited time, but it was apparent that he thought Shell waited too long due to the stay order. In addition, he claimed that he needed time to investigate the proposed movers to determine whether they were capable of moving the equipment. In one response to a letter by Shell telling him the move was arranged, he replied in letter with "Read my lips". Plaintiff was unable to explain what he meant by this statement.
Plaintiff explained that he was not able to disclose to Shell the name of the prospective purchaser when Shell requested the information to settle the claim for the loss of the sale. As testified to by Chaisson, he said that Chaisson did not want it known that he was interested in purchasing the paper for various reasons. When Chaisson eventually released him from the promise, he disclosed the name to the claims adjuster. Plaintiff noted that Chaisson spent several thousand dollars in this venture.
*251 Defendant was granted an involuntary dismissal after plaintiff rested his case. The trial judge granted the motion because he found that plaintiff failed to prove that Shell or its agents did any act to intentionally interfere with plaintiff's contact to sell the newspaper. He found instead that the agreement failed because plaintiff was unable to get official journal status and that the failure was not caused by Shell or its agents. The trial judge also found that plaintiff, who had asked for punitive or exemplary damages along with his other demands, was not entitled to punitive or exemplary damages and further, failed to prove he suffered any damages.
Under La.C.C.P. art. 1672, the trial judge may grant a motion for involuntary dismissal when the plaintiff has failed to show a right to relief. It should not be reversed in the absence of manifest error. Hutzler v. Cole, 93-0486 (La.App. 1st Cir. 3/11/94); 633 So.2d 1319, 1324; writ denied, 94-0850 (La. 5/13/94), 637 So.2d 1070. The appropriate standard for the trial judge to use to determine the merits of the motion to dismiss is whether plaintiff has presented sufficient evidence to establish his case by a preponderance of the evidence. Id. at 1323. See also: Luckette v. Orkin Exterminating Co., Inc., 534 So.2d 517 (La.App. 5th Cir. 1988).
In 9 to 5 Fashions, Inc. v. Spurney, 538 So.2d 228 (La.1989), the Louisiana Supreme Court set out the elements required to assert a claim for interference with contract. The court stated:
For purposes of analysis, the action against a corporate officer for intentional and unjustified interference with contractual relations may be divided into separate elements: (1) the existence of a contract or a legally protected interest between the plaintiff and the corporation; (2) the corporate officer's knowledge of the contract; (3) the officer's intentional inducement or causation of the corporation to breach the contract or his intentional rendition of its performance impossible or more burdensome; (4) absence of justification on the part of the officer; (5) causation of damages to the plaintiff by the breach of contract or difficulty of its performance brought about by the officer.
Id. at 234. In Spurney, the court recognized only a limited application of tortious interference with contract. The Spurney decision is limited to the "corporate officer's duty to refrain from intentional and unjustified interference with the contractual relations between his employer and a third person" Id. We have found no cases in this state that have expanded the application of the Spurney case beyond the elements set out there.
In this case, plaintiff did not prove that any corporate officer employed by Shell interfered with a contract or legally protected interest between Shell (the employer) and plaintiff (the third party). Here the contract was between plaintiff and Chaisson. Thus, we find that Shell is not liable to plaintiff under the theory of intentional interference with contract and the Spurney case.
In addition, we find that plaintiff failed to prove that Shell's conduct or actions caused or contributed to the loss of plaintiff's sale, under general tort theories or that the trial judge unilaterally terminated the contract for sale of the business. The evidence was clear that the reason that the agreement failed was because the Herald was not awarded official journal status, a condition of the contract to purchase. The evidence also showed that the Herald failed to obtain official journal status because of the poor quality of the paper and because of the political climate.
Contrary to plaintiff's assertion, the trial judge did not unilaterally terminate the contract. He found that that the contract ended for failure of a condition. See: La.C.C. art. 1767. Under La.C.C. art. 1773, when a contract contains a suspensive condition that an event shall occur and no time limit has been fixed for the completion of the condition, then the condition may be fulfilled within a reasonable time. When it becomes certain that the event will not occur, then the condition is considered to have failed. Id. Here, the condition of obtaining official journal status failed in 1989, and that is the reason that the contract was terminated. Thus, we find that the trial judge did not err in dismissing *252 plaintiff's claim for damages due to the loss of the sale of the Herald.
Plaintiff's claims for other types of damages was not supported by the evidence. His son testified that the equipment in the office building only required cleaning. He was paid a preliminary amount shortly after the explosion for the repair and cleaning of the equipment and would have been paid any other amounts, had he submitted documentation. However, he produced no documentation or other support for expenses or losses either to Shell or in trial. Further, the evidence at trial showed that he only used the office to address the papers and that the only publication issue the paper missed was due to credit problems, not damages from the explosion. Plaintiff failed to prove that suffered any damages or that the alleged damages were caused in any way by the explosion. Consequently, we find that the trial judge did not err in declining to award damages and in granting the motion for involuntary dismissal.
Accordingly, the judgment of the trial court is hereby affirmed.
Costs of this appeal are to be paid by plaintiff.
AFFIRMED.
NOTES
[1] Cynthia Yoes was originally a plaintiff, but subsequently withdrew from the action.
[2] Allegations related to Cynthia Yoes' damages are not recited here.
[3] The defendants, in brief, assert that plaintiff claimed loss of consortium of Hazel McNally, in the home of whom plaintiff rented a room. However, the record does not reflect this fact. The petition only asserts the loss of consortium claim as one of several listed elements of damage.
[4] See: La.R.S. 22:658; La.R.S. 22:1220.
[5] Complaints of unethical conduct by an attorney are governed by the Louisiana Bar Association Rules of Conduct.
[6] We are not deciding here that there can never be an action by a party against the adverse party's attorney(s) for misconduct or tortious acts of some other sort. Our statement is limited to the interference with potential settlement negotiations.
[7] Plaintiff's brief is vague and rambling and his arguments and issues are not clearly set out. However, we will address what we believe to be his complaints on appeal.