MARION F. EDWARDS, Chief Judge.
 

 |2P efendants/app ellants, Myron Ellis Singleton, A3M Vacuum Services Inc. and Clarendon America Insurance Company (Clarendon), appeal a judgment in favor of plaintiffs/appellees, Lawrence E. Brock (Mr. Brock) and Emma Brock (Mrs. Brock), in the amount of $1,236,419.70.
 

 On September 7, 2005, Mr. Brock was a truck driver for B & G Crane Service when he was struck in the rear by another truck, owned by A3M and driven by Mr. Singleton.
 

 Mr. Brock alleged damages to his neck and back that ultimately required treatment and disabled him from further employment as a truck driver. At the trial on
 
 *652
 
 the matter, liability was not contested. Rather, at issue was medical causation, the extent of any injuries suffered, and damages.
 

 Mr. Brock testified that he went through the ninth grade in school and then began working. From the age of fifteen or sixteen, he has always been employed as a laborer. While working for another employer in 1989, he was involved in an 1 .¡accident which caused injuries. He was injured for two or three years but got better and ultimately obtained a job driving eighteen wheelers. He worked for several employers doing similar work, beginning his employment with B & G in 1999.
 

 At the time of the accident, Mr. Brock and his family had been rescued from New Orleans following Hurricane Katrina. Living with him at the time were his wife, daughters, five grandchildren, and several others, for a total of thirteen persons for whom he was the sole support. After being evacuated to the Superdome, the family was moved to Baton Rouge and then to Lafayette. He had been back working for about a week before the present accident.
 

 On the day of the accident, at about 7 a.m., he was in his truck on the way to a delivery when another eighteen wheeler rear-ended his vehicle. He hit his head on the back glass, and the impact knocked him “silly” at that time and for the moment he did not know where he was. When he exited the truck he was in a daze and did not recall talking to the other driver. He reported the accident to B
 
 &
 
 G.
 

 He was not in pain prior to the accident. Immediately after the incident, at first he did not feel anything and continued with his chores, including delivering a load, but later, at around 1 p.m., he began to feel pain and stiffness in his neck. He worked through it. When he got home, he went to Summit Hospital. Summit Hospital records submitted into evidence indicate that, on the night of the accident, Mr. Brock complained of neck pain with a pain level of five, as well as headache and back pain.
 

 He was given muscle relaxers, but he could only take them after he got off of work because he could not drive while on medication. He returned to work the next day, and worked constantly, through pain, until he could go no longer, because his family had nowhere to go and he was trying to find a place for them to live. It was hectic finding doctors at that time in Baton Rouge; Mr. Brock saw Dr. LCherry about thirty or thirty-five times. Dr. Cherry sent him for therapy for his neck and back, but he felt worse so was sent to Dr. Johnston, who treated him for some months. Mr. Brock underwent several tests, some of which were quite painful. After Dr. Johnston, Mr. Brock went to Dr. White, who gave him cervical injections. Then he treated with Dr. Kenneth Vogel, who was his physician at the time of trial. Dr. Vogel performed surgery on a leaking disc.
 

 After the surgery, Mr. Brock felt he could return to work, but when he did so, he experienced discomfort and returned to Dr. Vogel. Dr. Vogel suggested another surgery, which Mr. Brock plans on having so that he can go back to work. He does things around the house, such as cut grass, even though they cause pain, because he cannot afford to pay for someone to do them. Prior to the accident he was happy, but since the accident he and his wife have been arguing, and suffered a loss in their sexual relationship. He wants to go back to being a truck driver. Today, he still wears a back corset and takes medication for pain. He left B & G because he could no longer stand the pain. Dr. Johnston
 
 *653
 
 had restricted him to light-duty work, but B & G does not have light duty.
 

 On cross-examination, Mr. Brock stated that he was told at the emergency room to see his doctor in two or three days, but he did not do so. He did not report that he was in pain to B & G because he could not afford to take time off. His supervisor, Barry Lindy, knew he had been hurt. Mr. Brock’s duties included coupling and uncoupling trailers, tying equipment with chains, etc. The first time he saw a doctor was November 11, 2005 at which time his attorney made an appointment for him. Mr. Brock admitted that, when he had to take a medical exam for his driver’s license, he lied about being in pain and about his medical history because he needed to work. He would lie in order to keep his job, but he would not lie to get insurance money from the court if he was not hurt.
 

 | sMr. Brock testified that he has trouble reading the newspaper and other documents. For Dr. White, whom he saw in September of 2006, Mr. Brock’s wife filled out the medical history form from answers he gave her. The form indicated he experienced pain in his leg, shoulder, fingers, back, foot, toes, head, arm, and hand. On the form it was mistakenly checked that he had experienced the pain for thirteen to twenty-four months before the visit. Although he sometimes uses a cane of his own volition, he checked that his pain did not require him to do so. Mr. Brock visited Ochsner for blood pressure medication, but he could not recall if he related his back and neck problems to the physician there.
 

 Mr. Brock attended six of his scheduled therapy treatments because he experienced pain, and one of the physicians at therapy told him he should not return until he saw Dr. Vogel. He also had problems with transportation to therapy. Mr. Brock testified that he has done things like change flat tires and pick up suitcases and grocery bags, but he “paid for it” after-wards, even though he had worn his corset and taken pain pills.
 

 Mr. Brock had a lawsuit in Florida seeking compensation as a result of injuries to his back in 1989. He had an exam prior to being employed at Simco in 1995, at which time Mr. Brock testified he was pain free. In his history, Mr. Brock had auto accidents in 2002 and 2003, resulting in treatment for soft tissue injuries, which symptoms resolved.
 

 Mrs. Brock testified that her husband had been happy and in good health prior to the accident, although he had trouble with his back after his accident in Florida. However, as time went on he had no more problems. After the 1989 accident, Mr. Brock did not work until 1994. Mr. Brock loved driving his truck, and was a hard worker but, since the accident in question, he became depressed, and they have no sex life. He does help out around the house with cutting grass Rand washing dishes, but he is jumpy, grouchy, and easily aggravated. They are not happy anymore. She herself is depressed and their marriage is bad; her world has been turned upside down. She is afraid they will not be able to pay their bills. Mr. Brock prays and she reads the Bible to him. On cross-examination, Mrs. Brock remembered other auto accidents in which her husband had been involved. On the night of the accident in question he told her he was having the worst back pain ever. However, he continued to work full time. She has seen Mr. Brock fall on more than one occasion.
 

 Bobby S. Roberts testified as an expert in vocational rehabilitation. He testified that Mr. Brock’s line of work is considered medium semi-skilled, with characteristics of heavy labor. After performing a num
 
 *654
 
 ber of tests, Mr. Roberts opined that Mr. Brock is considered functionally illiterate, scoring in the seventh percentile in his achievement tests, although he had good abstract problem solving skills. He was less than 50 percent of where he needed to be to meet the standards for competitive work; his sitting tolerance had to be increased by 83.4 percent; and his standing tolerance must increase by 87.5 percent. Mr. Roberts made several recommendations: Mr. Brock should be referred to a clinical psychologist for evaluation of depression and anxiety and to an educational specialist to determine if he has a learning disability and to help him develop compensatory skills. Mr. Brock should also be reevaluated by Dr. Vogel to diagnose bilateral weakness in his upper extremities and radicular symptoms in both legs. Structured physical therapy was also recommended. Mr. Brock cannot return to medium to heavy work, and there is only a 10 percent chance he will be able to perform light work because of his education.
 

 According to Mr. Roberts, Mr. Brock was cooperative in his evaluation and displayed no inconsistencies. Defendant’s expert Mr. Hegwood had recommended 17that Mr. Brock could be a dispatcher, but there are at least forty-seven different types of dispatchers requiring varying levels of training and different requirements for dealing with data. They require different reasoning levels. Mr. Brock did not meet the criteria for any of them. Mr. Hegwood’s recommendation of a job as exterminator is considered heavy labor. As an order filler, the light version of that job requires educational skills higher than those possessed by Mr. Brock. A shipping and receiving clerk is classified as medium, and can be heavy, requiring higher academic requirements.
 

 Dr. Vogel testified that he saw Mr. Brock in May 2007 for cervical and right shoulder pain, as well as low back and bilateral leg pain. There had been two motor vehicle accidents prior to the one in question but the pain from those had resolved completely. Dr. Vogel reviewed the records from all of the previous physicians. Tests revealed herniated lumbar discs at L3^4 and 4-5. An IDET annuloplasty to repair the tear in the discs was performed. Following surgery, Mr. Brock progressed satisfactorily at first and began therapy. Then he began to have pain and difficulty lifting, pushing, and pulling, at which time Dr. Vogel told him to avoid those activities. Two months after surgery, he had back pain riding in vehicles and in April 2007, also began experiencing bilateral leg pain and numbness. His condition had deteriorated. Tests revealed the IDET had not satisfactorily repaired the disc. There was now bilateral L-4 neuropathy. The objective tests correlated with Mr. Brock’s complaints. It is more probable than not that Mr. Brock will be required to undergo a laminectomy and reprogramming of the nerves to remove the herniation. Mr. Brock is disabled from his work. If Mr. Brock was symptom free from 2002 to the date of the accident, any injury he received prior to 2005 could be considered as resolved.
 

 |sOn cross, Dr. Vogel testified that the initial information given him by Mr. Brock included only the report of a 1978 accident. That entry was later changed to “1988” and the accident of 2002 was added on the report, although Mr. Brock had not told him about that originally. Dr. Vogel agreed that the history given by Mr. Brock was inaccurate. The history given by the patient is one of the factors that must be considered, because most people are not very good historians and when they have had a number of injuries, they cannot remember the details such as when the injuries happened. Any additional information, such as the 2002 accident and
 
 *655
 
 the medical report that pain had resolved, is taken into account. Utilizing medical probability, and taking into account the patient’s history, his neurologic examination, X-rays, MRI’s, and past medical record, Dr. Vogel opined that Mr. Brock’s signs and symptomology were causally related to the September 7, 2005 accident. There is no question that Mr. Brock has
 
 L-á
 
 neuropathy, that he has pain reproduction of his discogram, and that his neu-rologic examination suggests a real problem. There is no way of knowing whether the fact that Mr. Brock continued to work for a year as a truck driver and heavy manual laborer would have helped or harmed his condition.
 

 John Emery, Jr. is a shop steward and truck driver with B & G who worked with Mr. Brock. He witnessed the accident in question. He assisted Mr. Brock in filling out the company accident report and told him to report his injury. Mr. Brock complained of a stiff neck later that same evening, stating that he had hit his head on the back of the glass and his neck hit the dash. Prior to the accident, he had not complained of his back or neck, but afterwards, he did mention that he had started to take injections for back pain, and he often complained about pain in his back and leg. He observed Mr. Brock exiting the truck and having difficulty Instanding up. The loads are tied down by ratchet binders and chains and are unloaded by cranes.
 

 Fred Hollingsworth is the risk manager for B & G. B & G had an accident report filled out by Mr. Brock regarding the accident. Mr. Hollingsworth testified that Mr. Brock initially reported he was not hurt. Mr. Hollingsworth was not aware of any injuries to Mr. Brock until he was later notified the company was being sued for workers’ compensation benefits. Mr. Brock did not miss any work and did not complain of injury. Mr. Hollingsworth did not observe Mr. Brock having any difficulty with his job. To his knowledge, Mr. Brock’s truck was not damaged and no repairs were made to it. However, he had not examined the trailer before the accident.
 

 Randy Rice was accepted as an expert in economics. He testified that, using the wages being earned at the time Mr. Brock stopped working, past and future lost wages amount to $463,688; with a credit for minimum wages that could be earned, the amount is $365,240. Including future loss of fringe benefits of $48,069, which is the total value of the health insurance previously paid by his employer, lost wages and benefits equal $511,757, or $413,309 with the above-mentioned credit.
 

 Myron Singleton, driver of the truck owned by A3M that struck Mr. Brock, testified that the impact was “a light hit.” After the accident, Mr. Brock stated that he was all right.
 

 Scott Falgoust, manager of A3M, testified that the damage to Mr. Singleton’s truck was to the radiator, the cab, and the turbo; the fender was not damaged.
 

 Dudley Williams, safety director at B & G, spoke with Mr. Brock the day after the accident, and he was told that Mr. Brock did not need medical attention. Mr. Brock continued to work afterward, and there was no change in his duties. 110Although he did not have regular contact with Mr. Brock, Mr. Brock had always been honest with him.
 

 Barney Hegwood, qualified by the court as vocational rehabilitation counselor, was not able to evaluate Mr. Brock. However, he prepared a report based on a review of documents including medical reports and tax documents. It is preferable, but not necessary, to meet a plaintiff to determine disability. Mr. Hegwood reviewed Mr.
 
 *656
 
 Brock’s educational and employment information, along with his prior medical history; he was not able to test Mr. Brock. He would rely on a doctor for functional limitations, rather than the testing done by Mr. Roberts. Mr. Hegwood did not see any medical opinions on manual dexterity, alignment and driving, or other tests performed by Mr. Roberts. However, such tests are not necessary in the types of alternative jobs found. Mr. Hegwood did consider the limitations imposed by Dr. Vogel. According to Mr. Hegwood, Mr. Roberts is not licensed to perform a trans-ferrable skills analysis. Some of the items to consider in transferable skills analysis are aptitudes, physical demands, and temperaments. Considering his present injury, education, work history, functional limitations, etc., Mr. Brock could be a parking lot attendant, order filler, meter reader, groundskeeper, exterminator small sales route driver, dispatcher, or a shipping and receiving clerk. These occupations did not have greater demands than the work previously performed by Mr. Brock. Mr. Hegwood did not do a labor market survey. However, he testified as to the median wages of the suggested jobs.
 

 Deputy Sammy Robertson, who investigated the accident, stated that there were no reported injuries at the scene of the accident.
 

 Walter Delphin, a private investigator, testified that he surveilled Mr. Brock in June of 2006 and March of 2007. The court allowed DVD’s of his surveillance Ininto evidence. Mr. Delphin filmed several minutes of activity by Mr. Brock, walking around, bending over once.
 

 Natasha Strickland, another private investigator, also followed and filmed Mr. Brock driving to New Orleans, going to eat, to Ochsner, and Walgreens. She observed him carrying grocery bags and suitcases. On another occasion, he was seen sweeping outside of his church, bending over at the waist.
 

 The deposition of Dr. Henry Eiserloh, an orthopedic surgeon, was admitted into evidence. Dr. Eiserloh examined Mr. Brock on August 24, 2007. In the patient history, Mr. Brock denied previous neck or back problems, although he later told the physician he had had pain from an accident in the '70’s that had been treated. He did not give a history of any other accidents. During the physical exam, Dr. Eiserloh did not detect any spasms but, rather, indicated that there were “non-organic” findings that could not be substantiated by a specific objective finding. According to the physician, Mr. Brock exhibited exaggerated pain response. Dr. Eiserloh had not determined whether Mr. Brock had taken any medication prior to his visit. Dr. Eiserloh felt the MRI did not reveal any significant compressive lesion on any neurologic structure; the dis-cogram revealed a pathologic disc at L4-5 and, thus, a surgical candidate. However, based on the non-organic findings, he was at an increased risk for a poor outcome. The low level of vibration from driving a truck irritates the symptomatic discs, so Mr. Brock should not go back to being a truck driver. It was appropriate to say that if Mr. Brock was asymptomatic and not complaining of pain prior to the accident, he had not been disabled before the accident. Based on his history, it is more probable than not that the 2005 accident caused the symptomology to manifest.
 

 Following the trial, the court awarded damages in the following amounts:
 

 hgDamages Lawrence Brock
 

 Past lost wages and future loss of wages, fringe benefits, at present value $414,708.00
 

 
 *657
 
 Pain and suffering 300,000.00
 

 Mental Anguish 130,000.00
 

 Permanent disability and injury 100,000.00
 

 Loss of enjoyment of life 60,000.00
 

 Loss of consortium 30,000.00
 

 Past and future medical expenses 189,711.75 Past 89,211.75 Future 100,500.00
 

 Damages
 

 Emma Brock
 

 Loss of consortium 12,000.00
 

 On appeal, Clarendon argues several specifications of error. The first issue presented is that the trial court erred in awarding Mr. Brock damages for loss of consortium when such an award is not allowed under Louisiana law.
 

 Loss of consortium, loss of services and society are elements of damages that
 
 occurs to the relation
 
 of a party who suffers an injury under La.C.C. art. 2315. C.C. art. 2315 states that these damages are “recoverable by the same respective categories of persons who would have had a cause of action for wrongful death of an injured person.” C.C. art. 2315.2 provides the cause of action for wrongful death to the spouse and/or children or father and/or mother or brother(s) and/or sister(s). It is due to
 
 family members of the injured party, not
 
 to the injured party, who has his/her own other elements of damages that are recoverable. Loss of consortium is a secondary layer of tort liability and derivative from the injury to the primary victim. See:
 
 Shepard v. State Farm Mutual Auto. Ins. Co.,
 
 545 So.2d 624, 629 (La.App. 4th Cir.),
 
 writ denied,
 
 550 So.2d 627, 628 (La.1989)...
 
 [1]
 

 Mr. Brock contends that he proved interference with the sexual, social, and services aspect of his relationship with his spouse, and that such damages, although usually awarded as an undesignated part of general damages, were simply noted separately in this case. Although this may have been the intention of the trial court, it was granted as a separate item of damages, and we agree that loss of consortium is unavailable to Mr. Brock. This portion of the judgment must be reversed.
 

 haNext, Clarendon argues error in the credibility determination made by the trial court in favor of Mr. Brock. Clarendon contends that the trial court erred in completely accepting Dr. Vogel’s conclusions as to causation, disability, and damages, without considering Mr. Brock’s previous untruthful statements. Further, it is urged that the court erred in failing to consider as an adverse presumption the fact that Mr. Brock did call his other treating physicians, and in not considering Dr. Vogel’s refusal to answer direct questions about information contained in medical records which he claimed to review, but could not recall, while excluding those medical records.
 

 Factual determinations are subject to review for manifest error.... In such a review, the issue to be resolved by the reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder’s conclusion was a reasonable one.... If the factual findings are reasonable in light of the record reviewed in its entirety, a reviewing court may not reverse even though convinced that had it been sitting as the trier of
 
 *658
 
 fact, it would have weighed the evidence differently.... Where there are two permissible views of the evidence, the factfinder’s choice between them cannot be manifestly erroneous.... Further, where the findings are based on determinations regarding the credibility of witnesses, the manifest error standard demands great deference to the findings of fact.... Indeed, where the factfin-der’s determination is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous ....
 
 [2]
 

 In the present case, the trial court noted in its Reasons for Judgment that Dr. Vo-gel admitted Mr. Brock may not have been entirely truthful when it came to disclosing a full medical history. The court further stated:
 

 In the chronology of the accident, Brock returned to work the [sic] after the accident.... His drive to keep his employment and remain the breadwinner in his family would re-surface occasionally when he would shield complaints of pain or the nature of his condition from doctors, company personnel, or officials. However, he maintained that he was truthful throughout his testimony in the courtroom.
 

 [[Image here]]
 

 | uMr. Brock has not attained a high education level and comports himself to such a station in life. He does not have a perfect memory. He has a distinct degree of difficulty reading. He has satisfied the court that he is a credible person....
 

 The thrust of Clarendon’s argument on credibility relates to Mr. Brock’s failure to disclose all of his automobile accidents over the years to all of his physicians and his statements to B & G that he was not in pain. Although the trial court did not further explain its decision on this credibility issue, our reading of the record allows the conclusion that Mr. Brock did not deliberately make misstatements or omit information for the purpose of litigation or to obtain money,
 
 except for
 
 his guilelessly candid admission that he previously denied pain because he needed to work to support his family. Although he did lie in order to keep his job, we do not find that such impugns the entirety of his testimony. Rather, we are presented with a picture of a plaintiff who worked until he no longer was able to do so, and, as the trial court found, had a strong work ethic. Further, the medical evidence, including objective medical tests, corroborates his testimony and version of events.
 

 Contrary to Clarendon’s assertions, the trial court clearly considered all of the medical evidence placed into evidence. In the Reasons for Judgment, the court specifically recognized that Mr. Brock had suffered previous injuries, stating that it came to know Mr. Brock’s medical history, including the 1989, 2002, and 2003 automobile accidents. The court discussed the early medical assessment notes made a few hours after the injury and referred to the lengthy history of medical evaluation and treatment, noting that Clarendon had not objected to any of the extensive medical documentation. The medical records of treating physicians Dr. Cherry and Dr. Johnston were specifically considered. The court concluded the testimony and medical records supported its finding that the accident caused Mr. |1F,Brock’s injury and damages. Clarendon complains that
 
 *659
 
 the trial court refused to admit certain records which involved treatment of Mr. Brock’s injuries suffered in earlier accidents, with the indication that Dr. Vogel’s testimony cannot be evaluated properly in their absence. Clarendon concludes that the medical history given to Dr. Vogel, and his refusal to comment on the medical reports of certain other physicians, combined to render his testimony, as a whole, suspect and not credible.
 

 Prior to his testimony, Dr. Vogel reviewed the records of certain physicians who treated Mr. Brock in 1990, 1992, and 2002. We find nothing suspicious in his refusal to comment on the accuracy of the other physicians’ reports. After considering the earlier accidents and treatments, Dr. Vogel reiterated his opinion that, since Mr. Brock was symptom free prior to the accident, any injury from those earlier accidents could be considered as resolved and that Mr. Brock’s problems were causally related to the 2005 accident at issue. The diagnosis and opinion of the treating physician are entitled to more weight and more probative value than those of doctors examining plaintiff for consultation for litigation purposes only.
 
 [3]
 
 The facts on which Dr. Vogel’s opinion were based were substantiated in the record.
 

 A claimant’s disability is presumed to have resulted from an accident, if before the accident the injured person was in good health, but commencing with the accident the symptoms of the disabling condition appear and continuously manifest themselves afterwards, providing that the medical evidence shows there 11fito be a reasonable possibility of causal connection between the accident and the disabling condition.
 
 [4]
 

 While the records of earlier accidents and treatment may indicate that Mr. Brock’s back and neck were not in perfect health, it does not mean that they were not in “good health” for purposes of Housley,
 
 [5]
 
 He had been asymptomatic at least three years prior to the accident and had been able to perform all of his work duties without pain. Even Dr. Eiserloh testified that Mr. Brock was asymptomatic and not complaining of pain prior to the accident, he had not been disabled, and it was more probable than not that the 2005 accident caused the symptomology to manifest. There is nothing in the record to east suspicion on Mr. Brock’s condition in the several years prior to the accident. Mr. Brock was discharged from the care of Dr. Ott, who treated him for the 2002 accident, in November 2002, with a resolution of symptoms and without pain. He was working steadily and without apparent limitations until the accident at issue. Mrs. Brock testified that her husband had been in good health.
 

 Clarendon argues an adverse presumption should have been invoked against Mr. Brock for failing to call Dr. Weitz, who administered a cervical epidural injection; Dr. Burdine, who administered a diseogram; and Dr. Johnston, a treating physician. The records of all these physicians were entered into evi
 
 *660
 
 dence without objection. Clarendon is not entitled to any such presumption.
 

 In summary, there was sufficient evidence in the record for the trial court to conclude that Mr. Brock satisfied the
 
 Housley
 
 presumption and that the accident in question caused Mr. Brock’s injuries and subsequent disability.
 

 |i7CIarendon next contends the trial court erred in failing to grant a directed verdict when the evidence presented by Mr. Brock disclosed no legal or factual basis for the claims to proceed. A motion for involuntary dismissal is the proper procedural vehicle in cases where the action is not tried before a jury. In such motion, after the plaintiff has completed the presentation of his evidence, any party may move for a dismissal of the action as to him on the ground that, upon the facts and law, the plaintiff has shown no right to relief. La. C.C.P. art. 1672. The trial court has much discretion in determining whether to grant a motion for involuntary dismissal.
 
 [6]
 
 An appellate court may not reverse a ruling on a motion for involuntary dismissal unless it is manifestly erroneous or clearly wrong.
 
 [7]
 
 In determining whether an involuntary dismissal should be granted after the plaintiff has completed the presentation of his evidence during a bench trial, the appropriate standard is whether the plaintiff has presented sufficient evidence in his case-in-chief to establish his claim by a preponderance of the evidence.
 
 [8]
 
 The issue to be resolved is not whether the trier of fact was right or wrong, but whether the factfinder’s conclusion was a reasonable one.
 
 [9]
 
 The court here considered the medical evidence presented by Mr. Brock and found that such could support his case.
 

 Considering the testimony and evidence presented by Mr. Brock in his case-in chief, we find no error in the denial of the motion by the trial court as he provided sufficient evidence in his case-in-chief to establish his claim.
 

 Next, Clarendon contends that the court erred in excluding the testimony of its economic expert, Dr. Kenneth Bou-dreaux, because he was listed as a witness | )8three days after the deadline of the trial court’s trial order, although plaintiffs did not designate its experts until after the deadline. Mr. Brock filed a motion to strike the testimony of Dr. Boudreaux because the witness designation was filed late and because it did not receive his report until a few days before trial. The minute entry in the record indicates that the court denied Mr. Brock’s motion to strike Dr. Boudreaux’s testimony, and the transcript confirms that the court was “not inclined” to grant the motion to strike. Although the transcript indicates some confusion among the attorneys and perhaps even the trial court as to the status of the motion, we cannot find error in a ruling which is not part of the record.
 

 Clarendon urges that the trial courts award of $620,000 in general damages was an abuse of discretion, because Mr. Brock had prior neck and back injuries, once again arguing that Mr. Brock’s credibility was untrustworthy. Discounting the award for loss of consortium, which we reversed hereinabove, the general damage award comes to $590,000, which the trial court categorized as separate ele-
 
 *661
 
 merits of pain and suffering, mental anguish, permanent disability and injury, and loss of enjoyment of life.
 

 The standard for appellate review of general damages has been stated by the Louisiana Supreme Court as:
 

 General damages are those which may not be fixed with pecuniary exactitude; instead, they “involve mental or physical pain or suffering, inconvenience, the loss of intellectual gratification or physical enjoyment, or other losses of life or lifestyle which cannot be definitely measured in monetary terms.” ... Vast discretion is accorded the trier of fact in fixing general damage awards.... This vast discretion is such that an appellate court should rarely disturb an award of general damages.... Thus, the role of the appellate court in reviewing general damage awards is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact....
 

 ... Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or decrease the award.
 

 JiS- • •
 

 The initial inquiry, in reviewing an award of general damages, is whether the trier of fact abused its discretion in assessing the amount of damages.... Only after a determination that the trier of fact has abused its “much discretion” is a resort to prior awards appropriate and then only for the purpose of determining the highest or lowest point which is reasonably within that discretion. ...
 
 [10]
 

 In the present case, although Mr. Brock had suffered previous injuries to his back and neck, he was able to maintain a viable career as a truck driver prior to the accident in question, and he was the sole support of thirteen family members. Throughout his testimony, he exhibited concern about the support and welfare of his family absent his income. He had been able to enjoy a happy life, but today, he is unhappy, depressed, and argues with his wife with whom he has suffered a diminished sexual relationship. He must wear a corset and take medication for pain, and he will have to undergo major surgery on his back. He will never be able to return to his previous employment, which he loved. With regard to lost wages, Clarendon has not briefed its assignment of error regarding that portion of damages, and so it is considered abandoned.
 

 Based on our review of the evidence contained in the record, while the damage awards in this case may be on the high side, they are not so high as to constitute an abuse of the trial court’s vast discretion. Given the particular injuries and their effects under the particular circumstances on the plaintiffs, the trial court’s damage awards are not beyond that which a reasonable trier of fact could assess.
 

 Finally, Clarendon urges that the judgment against it must be in accordance with the policy terms and limits. No error was assigned concerning this issue and, thus, there is nothing for us to review.
 

 
 *662
 
 _|_2gFor the foregoing reasons, that portion of the judgment granting damages for Mr. Brock’s loss of consortium is reversed. In all other respects, the judgment is affirmed.
 

 REVERSED IN PART; AFFIRMED AND AMENDED
 

 [1]
 

 .
 
 Yoes
 
 v.
 
 Shell Oil Co.,
 
 95-12 (La.App. 5 Cir. 5/10/95), 657 So.2d 241, 247,
 
 writ denied,
 
 97-2087 (La. 11/17/95), 663 So.2d 714 (emphasis as found in the original).
 

 [2]
 

 .
 
 Tietjen v. City of Shreveport,
 
 09-2116 (La.5/11/10), 36 So.3d 192, 197-98 (citations omitted).
 

 [3]
 

 .
 
 Boxie v. Smith-Ruffin,
 
 07-264 (La.App. 5 Cir. 2/6/08), 979 So.2d 539 (citing
 
 Jaeckle v. Dresser Indus.,
 
 457 So.2d 646 (La. 1984)).
 

 [4]
 

 .
 
 Housley v. Cerise,
 
 579 So.2d 973 (La. 1991);
 
 LeBlanc v. Allstate Ins. Co.,
 
 00-1128 (La.App. 5 Cir. 11/28/00), 772 So.2d 400;
 
 Edwards v. LCR-M Corp., Inc.,
 
 41,125 (La.App. 2 Cir. 7/12/06), 936 So.2d 233.
 

 [5]
 

 .
 
 See, e.g., Layssard v. State, Dep't of Pub. Safety and Corr.,
 
 07-78 (La.App. 3 Cir. 8/8/07), 963 So.2d 1053,
 
 writ denied,
 
 07-1821 (La. 11/9/07), 967 So.2d 511;
 
 Poland v. State Farm Mut. Auto. Ins. Co.,
 
 03-1417 (La.App. 1 Cir. 6/25/03), 885 So.2d 1144.
 

 [6]
 

 .
 
 Perkins v. Carter,
 
 09-673 (La.App. 5 Cir. 12/29/09), 30 So.3d 862.
 

 [7]
 

 .
 
 Id.
 

 [8]
 

 .Id.
 

 [9]
 

 .
 
 Arbon v. Charbonnet,
 
 99-852 (La.App. 5 Cir. 1/25/00), 761 So.2d 20,
 
 writ denied,
 
 00-0603 (La.4/20/00) 760 So.2d 348.
 

 [10]
 

 .
 
 Dufrene v. Gautreau Family, LLC,
 
 07-467 (La.App. 5 Cir. 2/22/08), 980 So.2d 68, 81,
 
 writ denied,
 
 08-0629 (La.5/9/08) 980 So.2d 694, and
 
 writ denied,
 
 08-0628 (La.5/9/08) 980 So.2d 698 (citing
 
 Duncan v. Kansas City S. Ry. Co.,
 
 00-0066 (La. 10/30/00), 773 So.2d 670) (citations omitted).