JUDE G. GRAVOIS, Judge.
| ^Appellants, Chad and Candace Aucoin (“the Aucoins”), have appealed the trial court’s judgment granting an involuntary dismissal of their fraud claims against Ray Matherne and Ron Matherne (collectively, “the Mathernes”). For the reasons that follow, we affirm.

FACTS AND PROCEDURAL HISTORY

On April 17, 2007, Chateau Homes by RJM, Inc. (“Chateau”) filed suit against the Aucoins alleging that the Aucoins had entered into a building contract with Chateau for the construction of a new home for them on a lot they had recently purchased in St. Charles Parish. The contract provided for a total construction price of $202,312, payable in five installments as construction of the home progressed. Chateau’s petition alleged that the fourth installment under the contract was payable upon installation of the bricks and sheetrock, that the brick and sheet-rock work was completed, and that when demand for the fourth installment was made, the Aucoins reported that their lender’s building inspector |4had rejected Chateau’s workmanship and/or materials. The Aucoins refused to tender the fourth installment to Chateau. By letter dated October 13, 2006, the Aucoins terminated the building contract. Chateau alleged that this unilateral termination of the contract constituted a bad faith breach of the contract and claimed it still was owed $81,724.80 under the contract.
On June 6, 2007, the Aucoins answered Chateau’s petition admitting that they had entered into the building contract with Chateau, but alleged that their termination of the contract was with cause due to the numerous defects and errors made during the construction. They then specifically listed numerous defects, including defects in the roof, windows, master bathroom, fireplace, and bricks.
On September 14, 2007, the Aucoins filed their own petition for damages against Chateau, alleging that Chateau failed to comply with the terms of the building contract when it subcontracted the construction of their home to Kreative Kustom Homes, L.L.C. (“Kreative”). This petition alleged that Kreative acted as agent for Chateau and that the home was not built in a proper and workmanlike manner. The Aucoins then asserted a claim under the Louisiana New Home Warranty Act and listed the numerous construction defects.
On February 28, 2008, Chateau filed a motion to consolidate the suits, which was granted on March 7, 2008.
On September 10, 2010, the Aucoins filed a supplemental and amending answer to Chateau’s petition, and a reconventional demand and supplemental and amending petition for damages. In this pleading, the Aucoins asserted that they were within *400 their rights to terminate the building contract based on Chateau’s repeated failure to perform, that Chateau had not substantially performed its obligation under the building contract, and that Chateau’s failure to perform substantially impaired their interest in their home. Alternatively, the Aucoins |,^alleged that if the court concluded that they were not justified in terminating the building contract, then misrepresentations made by Chateau’s owner and President, Ray Matherne (“Ray”), and its Vice President, Ron Matherne (“Ron”), as to who was to build their home constituted fraud which vitiated their consent to the contract and constituted grounds for rescission of the contract.
In their reconventional demand, the Au-coins named Chateau and the Mathernes, individually, as defendants. They alleged that on April 28, 2006, they finalized a building contract with Chateau for construction of their new home for a total price of $202,312. In order to convince them to enter into the building contract, the Mathernes represented to them that Chateau would build their home and that Ron would personally oversee construction of their home. The petition further alleged that Chateau and the Mathernes never intended for Chateau or Ron to build their home; rather, Chateau entered into a contract with Kreative on May 8, 2006 to build their home for $178,845. They asked Ron about Chateau’s relationship with Kreative and Ron did not disclose that Chateau had entered into the contract with Kreative. The petition alleges that Chateau and the Mathernes misrepresented and suppressed the fact that they did not intend to build the Aucoins’ home in order to secure a profit of $23,467 for Chateau, and had they known the truth, they would not have contracted with Chateau.
In their supplemental and amending petition, the Aucoins alleged that the decision by the defendants to enter into the agreement with Kreative was the genesis of the defects in their home. They alleged that it was not possible for Kreative to construct their house for $178,845 and still make a reasonable profit thereon, and that Krea-tive had failed to use the materials called for in their house plans which were required by the building contract. Finally, they allege that the defendants were guilty of negligent misrepresentation.
| fiThis matter proceeded to a three-day judge trial. At trial, Chateau proceeded first with its claim against the Aucoins. Ron testified that he was Vice President of Chateau, which was owned by his father, Ray. As Vice President, he oversaw all home construction and dealt with the contractors and subcontractors. He stated that in 1999, Chad was employed by Chateau to do electrical work. In 2006, the Aucoins contacted RJM Enterprises, his father’s real estate development firm, about purchasing a lot. After purchasing a lot from RJM Enterprises, the Aucoins contacted Ray and asked for a price to build a home on the lot. The Aucoins provided the plans and specifications for the home. The parties agreed on a price and payment schedule. Ron signed the permit application and it was submitted on May 11, 2006. Ron testified that the Au-coins were involved in the construction of the home throughout the entire process. He and the owners were “there at every major milestone throughout construction.” There were some issues with the plans that the framers brought to his attention. These issues were discussed with the Au-coins, and the decision was made to modify the ceiling heights in the master bedroom and living room to resolve these issues. Ron’s own home was only a block away from the Aucoins’ home, so he was at the Aucoin construction site frequently (on an *401 almost daily basis, but in any event a minimum of three times per week). Chad performed the electrical work on the house, and after the brick and sheetrock phase, Ron requested the fourth payment from the Aucoins. He was told that the bank inspector had concerns about the windows and attic insulation and did not release the funds. Ron stated that he called the bank the next week and was told that the funds had been released to the Aucoins the week before. He then called Chad to request the fourth payment and according to Ron, Chad “threw us off the job.” The next week, he received a letter from the Aucoins’ attorney | germinating the contract. He did not return to the jobsite and did not receive any further payments.
When questioned as to the contract with Kreative, Ron testified that he signed the contract with Kreative to build the Au-coins’ home for $178,845. Chateau had worked out a partnership for Kreative to construct several homes. The Aucoins’ home was the fifth home that Chateau was constructing in this manner. At the time, Ray was sick with cancer and was not around to assist in the building of homes. Ron admitted that there was no actual partnership agreement between Chateau and Kreative. Ron did not recall who the subcontractors were that worked on the Aucoins’ house, but acknowledged that Kreative selected the subcontractors for the Aucoins’ house. Neither he nor Ray told the Aucoins about the contract between Chateau and Kreative. This was the manner in which Chateau was building homes at the time. There had been no major problems with the other houses Kreative had built for Chateau. Ron testified that it was not Chateau’s practice to give the owner a copy of the contract between Chateau and Kreative. Also, Ron felt that the Aucoins knew of Kreative’s involvement early in the construction process. Ron stated that it was not Chateau’s policy to disclose the names of every subcontractor to the homeowner. He acknowledged that at the time the contract was terminated, there were some issues with the Aucoins’ home, specifically some of the windows were not plumb and there was a problem in the attic, possibly insulation. Chateau was not given an opportunity, however, to address these problems because they were removed from the job. Ron stated that his role was to oversee the project and he was going to get these issues resolved. He was not surprised that issues came up during construction because it is typical to have issues with every construction project throughout the construction process. |sHe was not aware that the Aucoins were unhappy with Krea-tive as they were dealing with Kreative on almost daily basis.
Chad testified that he and his wife Candace purchased their lot from RJM Enterprises who was represented by Ray. Ray told them that his son Ron could build their home. He and Candace met with the Mathernes and reviewed plans for some of the other homes they had built. They did not find one that they wanted to build, so the Mathernes told them to go to A1 Champagne to have their plans drawn. After they were turned down for financing for the house by Chad’s credit union, the Mathernes suggested that they go to First National Bank who agreed to finance their loan. Chad testified that when he signed the contract with Ron, Ron told him that he would oversee the project, and it was his impression that Chateau through Ron would build the house. He admitted that the framers told him that Kreative was building the house. Once he became aware that Kreative was building the house, he questioned Ron and Ron said that Kreative was their partner. He was not aware that Chateau signed a building *402 contract with Kreative. He only saw Ron on the jobsite on one occasion. He testified that Ron did not communicate with him on a regular basis, and did not return his phone calls. He stated that he would not have signed the contract with Chateau if he had known that Kreative was going to build the home.
Chad then went on to describe the numerous defects in the house: the roof was buckled, there was a hole in the roof over the back patio, the windows did not operate properly because they were improperly installed, the wrong windows and wrong shingles were installed, some walls were bowed, there were loose bricks, the brick ledges under the windows were flat which did not allow the water to drain off of them, and the shower and tub in the master bath were not installed correctly causing them to crack.
| gCandace took the stand and her testimony corroborated Chad’s. She emphasized that the contract did not mention Chateau assigning construction of their home to another general contractor. She stated that Ron told them that he would be on the site every day to ensure that everything was going to be the way it was supposed to be. She never saw Ron at the construction site however. She became aware of Kreative’s involvement in the project when they put a sign in their yard during framing of the house. She and Chad terminated the contract with Chateau because they were not satisfied with the quality of the work.
Robert Foley, who was accepted by the court as an expert general contractor and cost estimating, testified on behalf of the Aucoins as to the numerous defects in the Aucoins’ home, the work necessary to repair the defects, and the cost of these repairs.
Ray testified that the contract between the Aucoins and Chateau called for Chateau to be the general contractor on the Aucoins’ home. The contract Ron signed with Kreative was to build the Aucoins’ home as the subcontractor. The Aucoins were not told about this contract or the contract with any other subcontractors. He stated that it was not Chateau’s normal practice to tell the owners who the subcontractors are. He also stated that it was not an unusual practice in the construction business for there to be an agreement between a contractor and a subcontractor for the constructing of an entire home by the subcontractor. He testified that the subject about the contract between Chateau and Kreative never came up with the Aucoins. He was unable to testify regarding Kreative’s profit margin. According to Ray, Kreative has its own employees, warehouse, and bulk materials. Finally, Ray admitted that Chateau was currently inactive because he had shut down several companies and consolidated his activities.
| ipFollowing Ray’s testimony, the Au-coins rested their case. All defendants then moved for an involuntary dismissal of the Aucoins’ case under La.Code of Civil Procedure Code article 1672(B) on the issues of fraud and personal liability of the individual defendants. They argued that the Aucoins failed to show an attempt to defraud them and that there was no evidence of misrepresentation. The Aucoins responded that they had selected Chateau as their builder because they believed Chateau would be the one selecting the subcontractors and overseeing the job. They argued that Chateau did not select the subcontractors and Ron did not oversee the project. They further argued the scope of the contract between them and Chateau and noted that the scope of the contract between Chateau and Kreative was exactly the same, and that this was not a classic contractor-subcontractor relationship. They further noted that the gen *403 eral contractor’s representative who was on the jobsite daily was a Kreative employee, not Ron or Ray. They contended that they believed that Chateau was going to build their house, and because the Math-ernes never intended to build their house from the beginning, there was error in the contract which was knowingly induced by the Mathernes.
The Aucoins then requested time to file a memorandum in response to defendants’ motion. The trial court denied the Au-coins’ request, then explained that the Au-coins had the burden of proving fraud by a preponderance of the evidence. The court explained that there was no evidence adduced to show fraud and granted the involuntary dismissal as to the Mathernes. The trial court then stated that he would render a written judgment on the involuntary dismissal at the, conclusion of the trial with the final judgment. The trial then continued with defendants’ presentation of their case. At the conclusion of the trial, the court took the matter under advisement.
InOn April 6, 2011, the trial court rendered judgment in favor of the Aucoins and against Chateau in the amount of $46,664.64 under the New Home Warranty Act, plus twenty-five percent attorneys’ fees and costs. The judgment was accompanied by sixteen pages of reasons for judgment. The Aucoins were then granted a new trial on the issue of attorneys’ fees, and their award of attorneys’ fees was increased to $84,227.50, plus costs. In awarding the attorneys’ fees, the trial court noted that while the Aucoins submitted evidence of $68,455.00 in attorneys’ fees, they were only awarded fifty percent of that amount because although they recovered under the New Home Warranty Act, their remaining causes of action were dismissed.
On August 5, 2011, the Aucoins filed a petition to appeal the judgment granting the motion to dismiss their fraud claims, denying their claim for recovery of the amount to satisfy a materialman’s lien, denying their claims for mental anguish or non-pecuniary damages, and the amount of attorneys’ fees and costs. On appeal, the Aucoins only brief their arguments relative to the dismissal of their fraud claims, stating that Chateau has since filed for bankruptcy protection. Thus, the only issue before us in this appeal is the grant of the defendants’ motion for involuntary dismissal of the Aucoins’ fraud claim.

ASSIGNMENT OF ERROR

The district court erred in granting an involuntary dismissal of the Aucoins’ tort fraud claims against the Mathernes when the evidence adduced at trial established that they told the Aucoins Chateau would build the house, Ron would supervise the construction, Chateau entered into a secret contract with Kreative to build the house, and the Aucoins relied on the Mathernes’ fraudulent misrepresentations to their detriment.

In their brief, the Aucoins first argue that Louisiana law authorizes tort fraud claims against officers and shareholders of a corporation. This argument by the | iaAucoins ⅛ misplaced. The trial court did not find that a tort fraud claim against the Mathernes was not allowed; rather, the court found that the Aucoins did not prove fraud by the Mathernes by a preponderance of the evidence.[1]
*404 Next, the Aueoins state the elements of the tort of fraud and the burden and nature of proof, and contend that they proved a misrepresentation of material fact made with the intent to deceive, justifiable reliance by them, and resulting injury. They then explain that the Mathernes never intended for Chateau to perform its obligation under the building contract; rather the Mathernes intended to enter into a separate secret contract with Krea-tive to build the home, noting that both Ray and Ron testified that they never told the Aueoins about their contract with Kreative. The Aueoins also contend that Ron lied to them when they questioned him as to Kreative’s involvement by stating that Kreative was Chateau’s partner when it was shown that there was no partnership agreement between the companies. The Aueoins conclude that their error as to who was going to build their home was “induced by the intentional misrepresentations” of the Mathernes and warrants rescission of the building contract for fraud. The Aueoins further argue that the Mathernes had an obligation to disclose Chateau’s relationship with Kreative when they questioned Ron about Kreative’s involvement. They cite inconsistencies in both the Mathernes’ testimony as to whether there had been any suits filed relative to the other homes that Krea-tive constructed for Chateau, as well as inconsistencies as to the status of Chateau at the time of trial.
The Aueoins then argue that they were justified in relying on Chateau’s advertisements that it specializes in building custom homes and uses local subcontractors. The Mathernes represented that Ron would personally oversee the construction of their home. The Aueoins argue they were reasonable in relying on | isthe representations made by the Mathernes based on their prior dealings with the Mathernes and the Mathernes having a good reputation in the community.
Finally, the Aueoins argue that their damages are directly attributable to Chateau’s decision to enter into a separate, secret contract with Kreative, ensuring that Chateau would make a profit of $23,467 on their home. The Aueoins reason that Ray either knew or should have known that Kreative had to hire the cheapest subcontractors and try to save money on the materials used in construction of the home in order to make a profit for Kreative.
The Aueoins conclude that in light of the extensive evidence that the Mathernes perpetrated a “serious fraud” on them and the district court’s finding that there was not “a scintilla of evidence adduced to show [the Mathernes’] fraud” at trial, this Court must conduct a de novo review of their fraud claims. Alternatively, the Au-eoins argue that the trial court’s ruling is manifestly erroneous and should be overturned.
The Mathernes contend that this appeal should be dismissed because Chateau has applied for bankruptcy and they personally were not parties to the contract sued upon. We find the appeal is properly before this Court as the Aueoins have appealed the judgment dismissing their fraud claims against the Mathernes.

LAW AND DISCUSSION

Louisiana jurisprudence indicates that the elements of the tort of fraud are a misrepresentation of material fact made with the intent to deceive when there was reasonable or justifiable reliance by the plaintiff and resulting injury. Schaumburg v. State Farm Mut. Auto. Ins. Co., 421 Fed.Appx. 434, 442 (5th Cir. 2011). For 114 purposes of the tort of fraud, the intent to deceive is a specific intent.
*405 Id.[2] In order to find fraud from silence or suppression of the truth, there must exist a duty to speak or disclose information. Id.
A motion for involuntary dismissal is raised in a judge trial after the plaintiff has completed the presentation of his evidence. Brock v. Singleton, 10-550 (La.App. 5 Cir. 3/29/11), 65 So.3d 649, 660. In this motion, a party may move for a dismissal of the action against him on the ground that the plaintiff has shown no right to relief based upon the facts presented and the law. Id. The trial court has much discretion in determining whether to grant a motion for involuntary dismissal and an appellate court may not reverse a ruling on a motion for involuntary dismissal unless it is manifestly erroneous or clearly wrong. Id. In determining whether an involuntary dismissal should be granted after the plaintiff has completed the presentation of his evidence during a bench trial, the appropriate standard is whether the plaintiff has presented sufficient evidence in his case-in-chief to establish his claim by a preponderance of the evidence. Id. On appeal, the issue to be resolved is not whether the trier of fact was right or wrong, but whether the fact-finder’s conclusion was a reasonable one. Id.
Our review of the record in this case convinces us that the trial court’s grant of the Mathernes’ motion for involuntary dismissal was reasonable. The Au-coins testified that pursuant to the contract they entered into with Chateau, they expected Ron to supervise the building of their home. Ron testified that one of his job duties as Vice President of Chateau was to oversee all of Chateau’s home construction projects. Ron testified that he lived near the Aucoins’ home and “a lot of times” he went to the site on a daily basis and was at the site a minimum of three times per |iaweek. While Chad testified that he only saw Ron at the site on one occasion and Candace testified that she never saw Ron at the site, both Chad and Candace admitted that they worked during the day, inferring that they visited the site in the evenings and/or on weekends.
The Aucoins argue that the Mathernes committed fraud because they were not told of the contract between Chateau and Kreative. However, Ray testified that the contract between Chateau and Kreative was akin to one between a general contractor and a subcontractor. Ray testified that it is not uncommon practice for a general contractor to have an agreement with a subcontractor specifically to construct a home. Ray further testified that it is not common practice for the general contractor to disclose to the owner the names or agreements between the general contractor and the subcontractors. While both the expert who testified on behalf of the Aucoins and the expert who testified on behalf of defendants testified that it is unusual for a general contractor to sign a contract with another general contractor to build a home, they both testified that it is not common practice for the general contractor to disclose the names or agreements of the subcontractors to the owners. Ron testified that at the time Chateau entered into the contract with the Aucoins to build their home, Chateau had a “partnership” with Kreative to build homes. While admitting that there was no formal *406 partnership agreement between Chateau and Kreative, Ron explained that “this was the way” Chateau was building homes at the time, explaining that at the time Ray was sick with cancer and was not available to assist in the construction process. Ray testified that Kreative had its own employees, warehouse and bulk materials, inferring that it was possible for Kreative to build the same quality home as Chateau for a lower price.
The Aucoins contend that the Mathernes were untruthful as to.whether they knew or should have known that Kreative had a history or poor workmanship and | 1fiargue that the trial court erred in limiting their ability to question the Mathernes regarding this history. They argue that they were required to prove that the Mathernes acted with “intent to deceive” and they were attempting to introduce evidence of Kreative’s prior bad acts to prove the intent of the Mathernes. The record before us indicates that although the trial court did limit questioning regarding issues of poor workmanship with the other houses built by Kreative for Chateau, the record does include indications of poor workmanship in two of the other houses that Krea-tive built for Chateau. Accordingly, the trial court was aware of evidence of poor workmanship in other houses that Krea-tive built for Chateau and based on this and all of the evidence introduced in the Aucoins’ case-in-chief still found that there was no intent by the Mathernes to deceive the Aucoins. The record reflects that the trial court was reasonably generous in allowing the Aucoins to present their case and in our opinion did not err in limiting the Aucoins in their efforts to present the evidence in question.
Our review of the evidence presented by the Aucoins at trial convinces us that they did not establish by a preponderance of the evidence that the Mathernes committed fraud. Ron testified that at the time Chateau entered into the contract to build the Aucoins’ home, Chateau was building homes by contracting with Kreative. Ron testified that he oversaw the construction of the Aucoins’ home until the Aucoins terminated the contract. When the Au-coins questioned Ron as to Chateau’s relationship with Kreative, Ron informed the Aucoins that Chateau had a partnership with Kreative. While it is clear that there was no formal legal partnership between Chateau and Kreative, Ron explained that at the time the Aucoins’ home was being constructed, Chateau was building homes by contracting with Kreative. While the Aucoins testified that they contracted with Chateau because they used local subcontractors, with the exception of the insinuation that |17the roofing subcontractor was not local, there was no evidence that the subcontractors who worked on the Au-coins’ home were not local and were not subcontractors that Chateau had also used in the past. Although the testimony is clear that Kreative selected the subcontractors for the Aucoins’ home, there was no evidence introduced that Chateau would have used different subcontractors.
Based on our overall review of the record in this case, we find that the trial court’s grant of the Mathernes’ motion for involuntary dismissal was not manifestly erroneous.

CONCLUSION

For the foregoing reasons, the judgment of the trial court is affirmed. The Aucoins are cast with all costs of this appeal.

AFFIRMED

. In their brief, defendants argue that tort fraud was not an issue submitted to the trial court. We find no merit to this contention, as the transcript indicates that there was an expansion of the pleadings to include tort fraud.

. See also Wooley v. Lucksinger, 06-1140, 06-1143, 06-1158, 06-1160 (La.App. 1 Cir. 12/30/08), 14 So.3d 311, writ granted, 09-0585 (La. 12/18/09), 23 So.3d 951, writ granted, 09-0586 (La. 12/18/09), 23 So.3d 951, writ granted 09-0584 (La. 12/18/09), 23 So.3d 952, writ granted, 09-0571 (La. 12/18/09), 23 So.3d 953, affirmed in part, reversed in part, 09-0571, 09-0586, 09-0584, 09-0585 (La.4/1/11),