WINDHORST, J.
h Plaintiffs, Michael Pitre and Nancy Pi-tre DeSalvo, individually and on behalf of decedent, Verna R. Pitre (“the Pitres”), appeal from the granting of a motion for involuntary dismissal[1] in favor of defendant, Jefferson Parish Hospital Service *504 District No. 2, Parish of Jefferson, State of Louisiana d/b/a East Jefferson General Hospital (“EJGH”) and DCI Door Controls, Inc. d/b/a Door Controls, Inc., (“Door Controls”), dismissing the Pitres’ cause of action with prejudice. For the reasons that follow, we affirm the decision of the trial court.
FACTS
On August 13, 2013, Mrs. Verna Pitre was attempting to exit EJGH through the automatic doors located on the second floor, exiting into the Hudson Street garage, when she was struck by the automatic door which closed on her. At the time, Mi’s. Pitre was eighty-seven years old and was walking with the aid of a walker. The door, which struck her on the left side, caused her to fall to her right, and she struck her head on the terrazzo floor immediately inside the automatic doors. Her husband, who had been with her, exited earlier to retrieve their automobile and drive it up to the door to pick her up. He did not witness the accident, but arrived moments later. Mrs. Pitre died approximately eighteen days later from her injuries and resultant complications. The parties stipulated that the fall and resultant injuries were the cause of Mrs, Pitre’s death.
Mrs. Monica Friedrichs was leaving the hospital at the same time as Mrs. Pitre and was an eyewitness to the accident. She testified that as she was approaching the automatic doors, trailing behind her husband and two grandchildren. She saw this “little lady,” later identified as Mrs. Pitre, with a walker, coming from the left of the doors, which were open. Mrs. Pitre was getting [ ¡ready to go through the doors and the doors started closing. Mrs. Fried-richs’ husband tried to grab Mrs. Pitre’s walker to stabilize it, and her grandson tried to stop the doors from closing, however they were unsuccessful. The doors slammed shut and struck Mrs. Pitre, and she fell to the right and hit her head on the floor. According to Mrs. Friedrichs, “the door hit her hard enough that it knocked her basically off her feet, hit her from the left, and she fell to the right and fell just straight out and hit her head.”
Wilmer Calix is a technician for Door Controls. He testified that the door at issue was manufactured by Stanley, and was a full-power automatic door. He had gone on many service calls to EJGH, and on these calls he would deal with EJGH employee Freddy Fernandez.
On July 26, 2013, Mr. Calix went to EJGH to replace some parts on the exit door, second floor, Hudson Garage, after another Door Controls employee, Mr. Rue-ben Urbina, generated a work ticket on July 23, 2013. Mr. Urbina’s ticket indicated an unsatisfactory safety rating in that the door did not have I-One sensors.[2] Mr. Ca-lix also indicated an unsatisfactory rating on his work ticket for the same reason. In his testimony, Mr. Calix stated that, in an automatic door without these presence sensing detectors, “the risk is that the door will close on somebody, should they be moving slow enough or coming at just the right angle where the motion sensors wouldn’t see them.. .Although it’s a very slight chance, the risk was still there.” It *505 was this risk that the presence sensors were designed to address.
Mr. Calix testified that he discussed the lack of these sensors with Mr. Fernandez on July 26, 2013, and that he went over scenarios with Mr. Fernandez in |3which these additional sensors might be important, including “like some little old lady on a walker, you know, going through there and being hit by the door.” Mr. Calix testified that Mr. Fernandez asked for a price quote to address the issue. Mr. Calix also stated that he believed he had discussed this issue in general with Mr. Fernandez, concerning both this door and other doors, although he admitted that his memory was vague.[3]
At trial, Mr. Calix stated that he did not think that the doors were “essentially unsafe,” but that there was always a small chance that if someone moved slowly enough in the right direction, the doors had the potential to close on them. He stated that the doors were “up to the original manufacturer’s specification, but not up to the current [American National Standards Institute (ANSI)] standards.” He further stated that he discussed the lack of sensors with Mr. Fernandez because they were not up to current standards, however this did not mean that the doors were unsafe. Mr. Calix clearly stated that he did not think that the doors were unsafe and that the work tickets, which found that they were unsatisfactory for failure to have the most current sensor, did not mean that the doors were dangerous.
Mr. Calix testified that he could not force a client to perform work on one of its doors, nor could he take a door out of service if it exhibited a “clear safety problem.” Mr. Calix stated that “There was no reason to take it [the doors] out of service since I already explained the door was safe.”
Freddy Fernandez testified that he was employed by EJGH in the Building Services Department, and that he was the person who oversees the maintenance and operation of the automatic doors in the facility. If there was a problem with an | ¿automatic door, he would call Door Controls. If Door Controls makes a recommendation, he would submit a purchase requisition to have the work performed. Mr. Fernandez testified that EJGH did not have a preventive maintenance contract on the automatic doors, but would call Door Controls on an as needed basis. Mr. Fernandez stated that he had made the call that led to Mr. Calix’s repair visit because the doors in question had begun opening and closing slowly. After the accident, Mr. Urbina of Door Controls inspected the doors, and recommended that presence sensors be upgraded. Thereafter, Mr. Fernandez took the necessary steps to upgrade the automatic doors.
After Mr. Urbina inspected the doors, they were taken out of service until upgraded. Mr. Fernandez stated that he turned off the power to the doors after they were inspected “because someone got hit by the door, to prevent it happening again.” When asked if the doors had ever hit someone else, Mr. Fernandez responded, “Never.”
Dr. Charles Carr was stipulated as an expert in the field of power-operated automatic doors and the standards that govern *506 that industry. Dr. Carr stated that the cause of the accident was that the sensors failed to detect Mrs. Pitre, and that the accident could have been avoided had the sensors been upgraded. He also stated that, in his review of the records, he found that EJGH did not conduct regular safety checks, and had these checks been performed, the “defect” with the sensors would have been discovered prior to the accident. However, Dr. Carr acknowledged that three other experts disagreed with his conclusion that the doors presented an unreasonable risk of harm of which EJGH should have been aware.[4] Dr. Carr also agreed that had Mrs. Pitre’s husband been with her, the doors would not have closed.
Is DISCUSSION
Mr. Pitre, the decedent’s husband, and Nancy Pitre DeSalvo, the decedent’s daughter, filed this petition for survival injuries and wrongful death against EJGH pursuant to La. C.C. arts. 2315, 2315.1, 2315.2 and 2317 and La. R.S. 9:2800, alleging that the automatic doors presented an unreasonable risk of harm and that EJGH knew or should have known of the risk. The matter proceeded to trial, and at the conclusion of the plaintiffs’ case, the trial court granted a motion for involuntary dismissal, dismissing their cause with prejudice.
In this appeal, the Pitres allege that the trial court failed to apply the proper legal test to determine constructive knowledge, and further failed to find that EJGH was not shielded from liability by Door Control’s failure to recommend removing the doors from service pending upgrade. The Pitres also allege that the trial court committed manifest error in failing to find that EJGH had actual knowledge that the sensors were not up to date, and that this created an unreasonable risk of harm.
In a claim for injury as a result of an alleged defective condition against a public entity such as EJGH, the plaintiff bears the burden of showing that: (1) the public entity had custody of the thing that caused the plaintiffs injuries or damages; (2) the thing was defective because it had a condition that created an unreasonable risk of harm; (3) the public entity had actual or constructive knowledge of the defect and did not take corrective measures within a reasonable time; and (4) the defect in the thing was a cause-in-fact of the plaintiffs injuries. To recover, a plaintiff bears the burden of proving all of these inquiries in the affirmative and failure on any one is fatal to the case. La. C.C. art. 2317; La. R.S. 9:2800; White v. Select Specialty Hosp., 12-611 (La.App. 5 Cir. 03/13/13), 110 So.3d 1254, 1260; Graff v. Jefferson Parish Hosp. Serv. Dist. No. 2, 09-598 (La.App. 5 Cir. 3/23/10), 39 So.3d 685, 690-91, writ denied, 10-0907 (La. 6/18/10), 38 So.3d 331.
^Constructive notice as it relates to actions against a public entity is defined as the existence of facts which infer actual knowledge. Constructive notice can be found if the conditions which caused the injury existed for such a period of time that those responsible, by the exercise of ordinary care and diligence, must have known of their existence in general and could have guarded the public from injury. Graff, supra at page 691; Jeansonne v. S. Cent. Bell Tel. Co., 08-568 (La.App. 5 Cir. 01/13/09), 8 So.3d 613, 621.
La. C.C.P. art. 1672B provides that after the plaintiff has completed the presentation of his evidence, any party may move for a dismissal of the action as to him on the ground that, upon the facts and law, *507 the plaintiff has shown no right to relief. The court may then determine the facts and render judgment against the plaintiff and in favor of the moving party or may decline to render any judgment until the close of all the evidence. In order to determine whether an involuntary dismissal is appropriate pursuant to article 1672B, the trial court must determine whether the plaintiff has presented sufficient evidence to establish his claim by a preponderance of the evidence.
A motion for involuntary dismissal is raised in a judge trial after the plaintiff has completed the presentation of his evidence. Chateau Homes by RJM, Inc. v. Aucoin, 11-1118 (La.App. 5 Cir. 05/31/12), 97 So.3d 398, 405; Brock v. Singleton, 10-550 (La.App. 5 Cir. 03/29/11), 65 So.3d 649, 660. In this motion, a party may move for a dismissal of the action against him on the ground that the plaintiff has shown no right to relief based upon the facts presented and the law. Chateau Homes, supra at page 405; Zapalowski v. Campbell, 08-55 (La.App. 5 Cir. 06/19/08), 988 So.2d 772, 774-775. In determining whether an involuntary dismissal should be granted after the plaintiff has completed the presentation of his evidence during a bench trial, the appropriate standard is whether the plaintiff has presented sufficient evidence in his case-in-chief to establish his claim by a preponderance of the evidence. Chateau Homes, supra at page 405.
An appellate court should not reverse an involuntary dismissal based on La. C.C.P. art. 1672B in the absence of manifest error. Autman v. Bd. of Supervisors, 36,981 (La.App. 2 Cir. 04/09/03), 843 So.2d 1183, 1184. To reverse the trial court’s grant of involuntary dismissal, the appellate court must find, after reviewing the record, that there is no factual basis for its finding, or that the finding is clearly ■wrong or manifestly erroneous. The issue is not whether the trial court was right or wrong, but whether its conclusion was reasonable. Broussard v. Voorhies, 06-2306 (La. App. 1 Cir. 09/10/07), 970 So.2d 1038, 1041-1042, citing Stobart v. State, through Dep’t of Transp. and Dev., 617 So.2d 880, 882 (La. 1993).
In finding that EJGH did not have notice, either actual or constructive, of the defect which created the unreasonable risk of harm, the trial court stated that
We find that DCI did make recommendations to East Jefferson Hospital on July 23rd, T3, and July 26th, 16 (sic), on what it would take to bring the doors into compliance with current ANSI standards but did not state that the doors were defective, unsafe, or that they presented an unreasonable risk of harm. If DCI had believed that the doors were defective, unsafe, or presented an unreasonable risk of danger, DCI testified that they would have taken the doors out of service.
Therefore, we find that the hospital did not have notice that the doors were defective, unsafe, or presented an unreasonable risk of harm. We therefore grant the motion for a directed verdict [involuntary dismissal].
We have reviewed the record and find no manifest error in the trial court’s conclusion that EJGH did not have actual or constructive knowledge that the doors were defective, unsafe or presented an unreasonable risk of harm. The Pitres allege that because the sensors were not up to date, the doors created an unreasonable risk of harm. They further contend that EJGH should have known of this unreasonable risk by virtue of the fact that it was informed that its door sensors |8were no longer up to date, and therefore the trial court committed legal error, necessitating a de novo review by this Court. We *508 disagree. The issue of what EJGH knew or should have known is clearly a factual issue, subject to the manifest error/clearly wrong standard.
In this case, Mr. Calix testified that, although he recommended that the sensors be updated to conform to modern standards, he did not consider that the outdated sensors created an unreasonable risk of harm, and that he conveyed this EJGH through Mr. Fernandez. Further while Dr. Carr, plaintiffs expert, testified that the accident could have been prevented had the sensors been upgraded, he also admitted that “it takes a certain amount of circumstances coming together as it did in this case to have a problem.” It was also established at trial that this was the only accident of its kind to occur with the doors in question. Accordingly, the Pitres’ contention that the trial court committed legal error and/or was manifestly erroneous is without merit.
CONCLUSION
For the above discussed reasons, the trial court’s judgment granting defendant East Jefferson General Hospital’s motion for involuntary dismissal and dismissing plaintiffs suit with prejudice is affirmed. Costs are assessed against plaintiffs.
AFFIRMED

. Although defendant EJGH titled its motion at the close of plaintiff's evidence as a "Motion for Directed Verdict,” it is clear that the motion was actually a Motion for Involuntary Dismissal, which the trial court acknowledged in its judgment.

. There are two types of sensors. The activating device is the motion sensor, and the safety device is the presence sensor. The I-One sensors, recommended on the work order, are presence sensors. At the time the doors were installed at EJGH, the presence sensors were "StanGuard” sensors, which would disable when the doors started to activate. StanGuard sensors were acceptable when the doors were installed. However, in July of 2013, the American National Standards Institute (A156.10) required that an automatic door have either I-one sensors or beams to detect a presence in the door path.

. EJGH’s Departmental Policies and Procedures, Building Services, provides in part that “All purchases shall be approved by the Director or his designee. All purchases that exceed the sum of $500.00 need a price comparison form completed, showing that three (3) vendors were called.” Bids from three vendors were obtained and a price comparison record was submitted on September 6, 2013. The I-One sensors were installed on September 11, 2013.

. Because the plaintiffs’ cause was dismissed at the conclusion of the presentation of its evidence, these experts who were defense witnesses did not testify.